960 F.2d 351
 22 Fed.R.Serv.3d 530
 Kenneth McClure YOUNG, II, Appellant,
v.
J. Michael QUINLAN, Patrick Keohane, Kenneth Moritsugu, Dr.
Paulo Depetrillo, Wallace Cheney, Walter Wells, Leroy
Blanks, Charles Lewis, Robert Zimany, Stan Ahlin, Kenneth
Kaufman, Jerry Blackburn, John Steppie, Richard Wagner,
Steven Bilger, Frank Woods, W.L. Garrison, George Thomas,
William Radloff, Vernon London, Charles Turnbo, Lt. Conrad,
Officer Spangler, H. Wiegand, John Doe Defendants 1-21, and
Other Unknown Defendants.
 No. 90-5845.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
June 3, 1991.
 Decided April 1, 1992.
 
 Kenneth McClure Young, II, pro se.
 James J. West, U.S. Atty. and Frederick E. Martin, Asst. U.S. Atty., Lewisburg, Pa., for appellees.
 Before: BECKER, NYGAARD, and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 Kenneth McClure Young II, formerly a federal prisoner, appeals the district court's order granting defendants' motion for summary judgment in his suit for monetary damages against various federal prison officials. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). We conclude that the district court erred in two respects: First, by dismissing the complaint as to defendant William Radloff, for lack of adequate service of process; and second, by granting summary judgment against Young on his claims under the Eighth Amendment that, a) prison officials failed to protect him from attacks by fellow inmates, and b) further, that the conditions of his confinement were inhumane. We conclude that the district court correctly granted summary judgment on Young's other claims, correctly dismissed certain defendants for failure to state a claim, and correctly denied Young's motion for class certification. Accordingly, we will affirm the district court order in part, but since we will reverse in part, we must remand the cause for further proceedings.
 
 I. FACTS
 
 2
 The events concerned here have been told, in part, in our earlier decision, Young v. Kann, 926 F.2d 1396 (3d Cir.1991).[1] We nonetheless find it necessary to detail the wretched conditions to which Young was subjected while confined at the United States Penitentiary at Lewisburg, Pennsylvania. Although appellees contest Young's allegations, they would, if proven, paint a picture of prison life that violates the United States Constitution.
 
 
 3
 For counterfeiting $42 in U.S. obligations, Young was sentenced to five years imprisonment. After serving six months of his sentence at the Federal Correctional Institution at Seagoville, Texas, he was transferred to a higher security prison, the United States Penitentiary at Lewisburg, Pennsylvania. The abuse he allegedly suffered there during his first five months of imprisonment forms the gravamen of his suit.
 
 
 4
 Two days after he arrived at Lewisburg, Young was interviewed by two Segregation Reviewing Officers, Captain George Thomas, and Richard Wagner, the case manager coordinator at Lewisburg. At the interview, Thomas and Wagner decided that Young should be transferred to a lower security prison, and while he awaited transfer be placed in the Segregation Housing Unit ("SHU"). Thomas and Wagner based their decision on Young's files, his medical status, and his youthful and diminutive stature.[2] Young requested that he be placed in protective custody until his transfer. Thomas, however, told Young that would not be necessary, because he would ensure that Young was protected in the SHU.
 
 
 5
 During the late night and early morning hours of April 21-22, Young's violent ordeal at Lewisburg began. Young's cellmate began asking Young, repeatedly, to have sex with him. After Young refused, his cellmate threatened Young and attempted to climb onto his bunk. At one point an officer making his rounds approached the cell. Young's cellmate told Young that if he said anything to the officer he would be killed. After the officer left, Young's cellmate "started slapping [him] demanding sex." Young was able to ward off his cellmate's sexual advances that night.
 
 
 6
 The next morning, Young handed an inmate-orderly a note addressed to Officer Steven Bilger about the incident. Bilger then came to Young's cell and told Young that he could not be moved because of his medical condition. After Bilger left, Young's cellmate began "spitting in plaintiff's face, slap[ping him] up side his head and shoving [him] into the wall." An inmate-orderly saw the incident and alerted Bilger. Bilger again came to Young's cell and Young again asked to be moved. Bilger then told Young that he should write a letter asking to be moved and that he would take it to Lieutenant London. Young's cellmate told Young that if he wrote anyone a letter he would be killed. Young wrote the letter and handed it to the inmate-orderly to give to Bilger. Young was then moved to a new cell.
 
 
 7
 One week later, Young's new cellmate assaulted him and demanded sex. Young again warded off his cellmate's sexual demands. The new cellmate also threatened to kill Young if he told anyone of the incident. That night, Young wrote a letter to Warden Keohane, Lieutenant London, and Captain Thomas telling them of the incident, and requesting protective custody. Prison officials did nothing. On May 15, Young's cellmate dunked Young's head in a toilet in an attempt to convince Young to have sex with him. Young wrote another letter to Keohane, Thomas and London telling them of the incident and again he requested protection. Prison officials again did nothing.
 
 
 8
 On May 16, Young filed an administrative request for protective custody. Three months later the Bureau of Prisons, by Charles Turnbo, denied his request. On May 16, Young also explained the head-dunking incident to an unnamed officer and once again requested that he be moved. The officer told Young that he could not move him because of his medical condition, but that he would inform SHU Lieutenant Conrad[3] and Officer Spangler of the situation. Prison officials again did nothing.
 
 
 9
 On May 29, Young's cellmate "pulled a razor blade on him threatening to kill him if he did not decide real soon to become his wife and have sex with him." On May 30, when Young's cellmate was showering, Young wrote a letter to London and Thomas and handed it to Officer Diamond.[4] Shortly afterwards, Officer Marshall[5] told Young that he had delivered the note to Spangler and that Spangler had decided not to move Young. Young, in despair that he had no official relief, told Marshall that he was not going to let his cellmate reenter the cell. When guards attempted to deliver Young's cellmate to the cell, Young then began pounding the door with a milk crate. Young was transferred to a different cell, but given an incident (disciplinary) report.
 
 
 10
 On June 1, at a prison disciplinary hearing before John Steppie and McDermott,[6] Young "informed them of the events that had been taking place and his unsuccessful attempts at getting moved." According to Young, McDermott told Young that "protection was not one of his duties, that plaintiff had better learn to get along because the officials at Lewisburg do not like cry babies."
 
 
 11
 Young further alleges that on June 2, 1988, his cellmate told him that he wanted Young to leave the cell permanently. The two then argued, and his cellmate punched Young in the stomach and face. His cellmate then "grabbed a razor blade that was attached to a toothbrush, placed it to plaintiff's throat, coerced him to his knees and forced plaintiff into an act of fellatio." After the incident, his cellmate told Young that if he did not move out of the cell the next day, the inmate would "rape his anus." That night, Young wrote a letter to Keohane, Thomas, London, and Wells in which he explained the incident and asked to be moved.
 
 
 12
 On June 3, when officials took no action, Young began pounding on his cell door to attract attention. An unnamed officer approached the cell, and Young told him of his need to be moved. The officer told Young that he would inform Lieutenant Radloff of the situation. The officer returned ten minutes later and told Young that Radloff was not going to move him. Young continued banging on the door. Thirty minutes later Radloff came to Young's cell. After telling Radloff of the incident, Radloff stated that "[y]ou can bang on the door all day, I'm not going to move you. You got moved three days ago and I'm not going to move you again." Young continued pounding on his cell for two hours and then stopped. Young's cellmate then told him, "if you don't get moved you know what's going to happen." He then told Young to stop up the toilet and flood the cell. Young did so and flooded the cell.
 
 
 13
 As a result, prison officials placed Young in a "dry cell" for the next 96 hours, from June 3 to June 7. A "dry cell" has no toilet, no running water, and in Young's case, prison officials did not even provide him with toilet paper. Young alleges that he was neither allowed to wash before eating, nor shower during these four days. Throughout this period, he suffered from diarrhea.
 
 
 14
 Young attempted to explain to Radloff why he flooded the cell, however, Radloff interrupted Young and told him that, "he had better not hear a peep out of him, for if he did, he would chain plaintiff down to the steel slab indefinitely, and that plaintiff better not ask the officers for anything because it would be like whistling in the wind." At 6:00 p.m., on June 3, Young requested a blanket from Officer Troutman[7] because he was cold. Troutman, however, told Young that Radloff had ordered him not to give him anything. Young explained to Troutman that he had tested HIV positive and did not want to catch a cold. Troutman then gave Young a blanket and told Young not to tell anybody who gave it to him.
 
 
 15
 After the shift of officers changed at midnight, Young asked the officers on duty if he could leave the dry cell in order to defecate and urinate. The unnamed officers told Young that he could not leave the cell. Young then asked where he should relieve himself. The officers stated, "where ever you want to in that cell," and began laughing. Young then asked if he could have a drink of water. The officers told Young to "drink your piss," and continued laughing. The officers then told Young to settle down, because they had orders to chain him down if he became disruptive. Young attempted to hold in his urine, but because of the pain was forced to urinate in the corner of his cell.
 
 
 16
 After the shift changed at 8:00 a.m., Young asked an unnamed officer if he could leave the cell to defecate. The officer told Young that he could not because he was too busy. An hour later, Young asked the officer again. He was again told that he could not leave the cell because the officer was too busy and that Young should be quiet or he would chain him to a steel slab. Young then went to a corner of the cell where he defecated. At 8:00 p.m., after the shift of officers changed, Troutman for the first time provided Young with a plastic urinal and told Young that he could leave the cell to defecate if he wanted. This, however, was 29 hours after Young was placed in the dry cell. Young told Troutman that he did not need to defecate at the time. Because of the stench, an inmate on duty refused to clean the cell so Troutman had the inmate-orderly give Young utensils to clean it himself.
 
 
 17
 During the 4:00 p.m. to 12:00 a.m. shift on June 5, Young twice asked an unnamed officer if he could leave the cell to defecate and empty his urinal. The officer stated that he was too busy and would do it later. A short while afterwards, Young asked again and again his request was denied. Three hours after making his initial request, Young was permitted to empty his urinal but was not allowed to leave the cell to defecate. Young asked the officer a few more times if he could leave the cell to defecate. The officer denied Young's additional requests. On June 6, Young was allowed to leave the cell to defecate, and he was allowed to empty his urinal. On June 7, Young was removed from the dry cell.
 
 
 18
 On September 9, Young was moved to a different section of the prison and placed in a cell that was immediately next to the cell of the inmate who had sexually assaulted him on June 2. Young explained to Conrad that if he were moved to this section he would likely be killed, because a death hit had been placed on his head by the Texas Death Syndicate. Conrad stated that "he did not want to listen to plaintiff's cry baby excuses." Between September 11 and 15, Young wrote five letters to Keohane telling him of his situation and requesting protective custody. Prison officials, however, did nothing. On September 17, Young attempted suicide by slitting his wrist. He stayed in the infirmary until September 19.
 
 
 19
 On September 22, Young attended a review hearing conducted by Thomas and Wagner. During the review hearing, Young told Thomas and Wagner about his fear of gang members. Thomas and Wagner, however, said that they had no information to substantiate Young's concerns. On September 29, Young filed an official request to recreate alone, claiming that he was being forced to recreate with an inmate who posed a serious danger to him. On the same date, Young also informed Spangler and Conrad of his recreation concerns. On October 7, Young's September 29 official request was denied.
 
 
 20
 On October 28, 1988 a final recommendation was made to transfer Young. Young was first transferred to the Federal Correctional Facility in Phoenix, Arizona, then to the Federal Correctional Institution at Bastrop, Texas where he served the remainder of his sentence.
 
 II. PROCEDURAL HISTORY
 
 21
 Young filed a Bivens action alleging that various federal prison administrators and employees violated his Eighth Amendment right to be free from cruel and unusual punishment: (1) by acting with deliberate indifference to his serious medical needs; (2) by failing to adequately protect him from attacks by other inmates; (3) by confining him in unsanitary living conditions; (4) by disciplining him for flooding his cell without allowing him to appear before a disciplinary hearing officer; (5) by improperly transferring him to Lewisburg, and delaying his transfer away from Lewisburg; and (6) by entering into a conspiracy to murder him. Young requested both monetary and injunctive relief,[8] and sued defendants in both their individual and official capacities. Young also filed a motion for class certification, and a motion to compel discovery.
 
 
 22
 Young's complaint names 23 individual defendants and 21 "John Doe" defendants.[9] We will arrange these defendants in three groups: (1) federal prison officials and employees at Seagoville, Texas and El Reno, Oklahoma (the "Seagoville defendants"[10]), (2) officials with the Federal Bureau of Prisons (the "Bureau of Prisons defendants"[11]), and (3) federal prison officials and employees at the Lewisburg penitentiary (the "Lewisburg defendants"[12]). The United States Attorney filed a motion to dismiss or alternatively for summary judgment on behalf of all the named and unnamed defendants. The government also moved, pursuant to Fed.R.Civ.P. 26(c), for an order staying all discovery.
 
 
 23
 In support of his complaint, Young provided copies of incident reports, special housing unit reviews, letters sent to prison officials and official requests for protective custody and other administrative remedies. Young provided a letter, dated October 17, 1988, from a fellow inmate in which the inmate stated that he heard Young tell an officer that Young was concerned for his personal safety.[13]
 
 
 24
 Young also included an affidavit from the prisoner-orderly who was asked to clean Young's dry cell. In the affidavit, the orderly stated that he refused to clean the cell because of the strong odor, and that he saw feces in a corner of the dry cell. Young also included two affidavits from prisoners who stated that Young was permitted to defecate outside of the dry cell only once. In one of these affidavits, a fellow prisoner stated that he spoke with Young, and that Young told him that he was forced to defecate and urinate in the corner of the cell. This documentation is largely unrebutted by the appellees.
 
 
 25
 The district court denied Young's motions and dismissed the complaint as to the Seagoville defendants for lack of personal jurisdiction. The court further dismissed the complaint as to the Bureau of Prisons defendants for failure to state a claim. Additionally, the court dismissed the complaint as to W.L. Garrison, Leroy Blanks, Robert Zimany, and William Radloff, for insufficient service of process. The court then granted summary judgment in favor of all remaining defendants. The court dismissed Young's motion to compel discovery as moot.
 
 III. DISCUSSION
 
 26
 Our standard of review with respect to a district court's dismissal of a complaint is plenary. See, e.g., Roman v. Jeffes, 904 F.2d 192, 194 (3d Cir.1990); Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.1988). In reviewing a district court's grant of summary judgment, we are required to apply the same test the district court should have utilized initially. Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir.1990). Viewing the evidence in the light most favorable to Young, we must determine if the prison officials, as the parties moving for summary judgment, have met their burden of showing there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 
 
 27
 As a preliminary matter, we find that the district court correctly denied Young's motion for class certification, for the reasons enumerated in its Memorandum and Order dated August 13, 1990. The court also correctly dismissed the complaint as to the Bureau of Prisons defendants for failure to state a claim.[14] We further conclude that the district court correctly granted summary judgment on all claims against the Seagoville defendants. The district court correctly granted summary judgment on Young's claims that appellees disciplined him for flooding his cell without allowing him to appear before a disciplinary hearing officer,[15] improperly transferred him to Lewisburg and delayed his transfer away from Lewisburg,[16] entered into a conspiracy to murder him,[17] and were deliberately indifferent to his serious medical needs.[18]
 
 
 28
 We hold, however, that the district court erred by dismissing Radloff for failure to effect service of process. We also hold that the district court erred by granting summary judgment on Young's claims under the Eighth Amendment, that appellees failed to adequately protect him from attacks by other inmates, and confined him in unsanitary living conditions. We will remand this case for further discovery and so will vacate the district court's order foreclosing discovery. We also suggest that the district court consider whether counsel should be appointed to assist him with discovery and trial.A. Dismissal for Failure to Serve
 
 
 29
 The district court dismissed Young's complaint against defendant Radloff, reasoning that he was not served with the complaint.[19] According to 28 U.S.C. § 1915(c), "officers of the court shall issue and serve all process, and perform all duties in [in forma pauperis ] cases." See also Fed.R.Civ.P. 4(c)(2)(B)(i). Since the district court granted Young leave to proceed in forma pauperis, it was the district court's responsibility to serve process upon all defendants and thus Young should not be penalized for failure to effect service where it failed through no fault of his own. See Welch v. Folsom, 925 F.2d 666, 669-70 (3d Cir.1991); Puett v. Blandford, 895 F.2d 630, 635 (9th Cir.1990). Young merely needed to "request service upon the appropriate defendant and attempt to remedy any apparent service defects of which [he had] knowledge." Rochon v. Dawson, 828 F.2d 1107, 1110 (5th Cir.1987). Young contends that the prison officials informed him that Radloff was served on January 26, 1989. Accordingly, the court should not have dismissed the complaint as to Radloff on the grounds that Young failed to effect service, but should instead have complied with 28 U.S.C. § 1915(c) and made sure Radloff was served. Welch v. Folsom, 925 F.2d at 670.
 
 B. Eighth Amendment Claims
 
 30
 The Eighth Amendment to the United States Constitution prohibits any punishment which violates civilized standards and concepts of humanity and decency. Estelle v. Gamble, 429 U.S. 97, 102-03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); Tillery v. Owens, 907 F.2d 418, 425-26 (3d Cir.1990); Peterkin v. Jeffes, 855 F.2d 1021, 1023 (3d Cir.1988). There is no static test by which courts determine whether conditions of confinement are cruel and unusual. Rather, what constitutes cruel and unusual punishment is measured by the evolving standards of decency that mark the progress of a maturing society. Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Because we are guided by societal standards we must place great weight on the public attitude toward a given sanction, rather than on expert opinions. Rhodes, 452 U.S. at 348-49 n. 13, 101 S.Ct. at 2400; Tillery, 907 F.2d at 426.
 
 
 31
 Deficiencies and inadequacies in prison conditions do not necessarily violate the Eighth Amendment. The amendment is violated only when an inmate is deprived of "the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399; Tillery, 907 F.2d at 426; see also Inmates of Occoquan v. Barry, 844 F.2d 828, 837 (D.C.Cir.1988) ("It is cruel conditions, defined by reference to community norms, to which the Constitution speaks[.]"). Although inmates are, undeniably, sent to prison as punishment, the prison environment itself may not be so brutal or unhealthy as to be in itself a punishment. Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979); Tillery, 907 F.2d at 426.
 
 
 32
 The Supreme Court has recently clarified the standard for Eighth Amendment violations suffered during imprisonment. Wilson v. Seiter, --- U.S. ----, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In Wilson, the Court held that an inmate must prove both an objective element--that the deprivation was sufficiently serious,[20] and a subjective element--that a prison official acted with a sufficiently culpable state of mind.[21] Wilson, --- U.S. at ----, 111 S.Ct. at 2324; See generally Hudson v. McMillian, --- U.S. ----, 112 S.Ct. 995, 999-1000, 117 L.Ed.2d 156 (1992). The Court noted that a state of mind requirement derives from the plain language of the Eighth Amendment:
 
 
 33
 The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment. If the pain inflicted is not formally meted out as punishment by the statute or sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.
 
 
 34
 Wilson, --- U.S. at ----, 111 S.Ct. at 2325 (emphasis in original). The Court articulated that the requisite state of mind for an Eighth Amendment violation concerning a prisoner's conditions of confinement or protection afforded him against other inmates, is deliberate indifference.[22] Wilson, --- U.S. at ----, 111 S.Ct. at 2326-27. See also Estelle, 429 U.S. at 103, 97 S.Ct. at 290; LaFaut v. Smith, 834 F.2d 389, 391 (4th Cir.1987).
 
 
 35
 Since Wilson, there has been a split among circuit courts regarding the quantum of knowledge possessed by a prison official, necessary to satisfy the deliberate indifference requirement. In Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir.1991) ("Colburn II "), we held that the Fourteenth Amendment imposes an obligation on government officials who know or should know of an inmate's particular vulnerability to suicide, not to act with reckless indifference to that vulnerability. See also Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir.1989); Freedman v. City of Allentown, 853 F.2d 1111 (3d Cir.1988). Consistent with our approach in Colburn II, the Ninth Circuit Court of Appeals has held that a prison official is deliberately indifferent for purposes of the Eighth Amendment when he "knows or should know" of the danger facing the inmate. See Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir.1991), quoting Colburn v. Upper Darby Township, 838 F.2d 663, 669 (3d Cir.1988). On the other hand, the Seventh Circuit Court of Appeals has held, after Wilson, that liability should only be imposed on prison officials if they had "actual knowledge of impending harm," and has rejected liability for prison officials who merely "should have known" of danger to an inmate. McGill v. Duckworth, 944 F.2d 344, 348 (7th Cir.1991). Because we agree with Redman that it is appropriate to use the same standard under the Fourteenth and Eighth Amendments here, Redman, 942 F.2d at 1442, we hold that a prison official is deliberately indifferent when he knows or should have known of a sufficiently serious danger to an inmate. We stress, however, that in constitutional context "should have known" is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. We have expressed that "should have known:"
 
 
 36
 [D]oes not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk ..., though something less than subjective appreciation of that risk. The "strong likelihood" of [harm] must be "so obvious that a lay person would easily recognize the necessity for" preventative action, M[onmouth] C[ounty] C[orrectional] I[nst. Inmates v. Lanzaro], 834 F.2d [326,] 347 (3d Cir.1987) ]; the risk of ... injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.
 
 
 37
 Colburn II, 946 F.2d at 1025 (emphasis added).
 
 
 38
 Therefore, in order for Young to withstand the government's motion for summary judgment, he must have raised genuine issues of material fact that the alleged deprivations were sufficiently serious and that the prison officials in question acted with deliberate indifference. Because we conclude that Young has met this burden as to some, but not all, of the individual Lewisburg prison officials named in his complaint, we will reverse the part of the district court's order granting summary judgment in favor of the appellees Keohane, Wells, Wagner, Steppie, Thomas, London, Radloff, Conrad, Spangler, Bilger, and John Does 9 through 12.
 
 1. Personal Security Claim
 
 39
 The district court did not expressly address Young's claim that the Lewisburg officials did not adequately protect him from attacks by other inmates. District Court Memorandum at 6-9. Nevertheless, we assume that the district court found no merit to this claim as it granted summary judgment in favor of the appellees on all claims. District Court Order at 2. We find that Young has raised a genuine question of fact with respect to the constitutionality of appellees' failure to adequately protect him from other inmates.
 
 
 40
 It is well established that the Eighth Amendment affords an inmate a right to be protected from violence inflicted by other inmates. See Wilson, --- U.S. at ----, 111 S.Ct. at 2327; Riley v. Jeffes, 777 F.2d 143 (3d Cir.1985); Hoptowit, 682 F.2d at 1250. In Riley, we recognized that "[w]hen prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners and the level of violence becomes so high ... it constitutes cruel and unusual punishment." 777 F.2d at 145, quoting Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir.1981). We further commented:
 
 
 41
 The tension and danger to prisoners must be particularly intensified and pervasive where an overpopulated prison is occupied by aggressive felons prone to violence, as alleged in this case, who also have ready access to cells when the occupants are asleep and are unprotected by prison guards[.]
 
 
 42
 ... The conditions of his confinement promote a lack of personal safety which is enhanced by the alleged 'deliberate indifference' of the supervisory personnel to the prisoner's protected interests.
 
 
 43
 777 F.2d at 145 (citations omitted). We held that in order for an inmate to obtain relief, he must show "a pervasive risk of harm to inmates from other prisoners, ... and that the prison officials have displayed 'deliberate indifference' to the danger." 777 F.2d at 147 (citations omitted); cf. Frett v. Government of Virgin Islands, 839 F.2d 968, 978 (3d Cir.1988) (knowledge of prisoner's extremely dangerous propensities and failure to protect others from that prisoner sufficient to raise § 1983 claim).
 
 
 44
 By his incarceration, Young is forced to accept the custody of these prison officials. The Supreme Court held that "the state had an affirmative duty to provide adequate medical care for prisoners since incarceration prevents an inmate from caring for himself." Estelle, 429 U.S. at 103-104, 97 S.Ct. at 290. In Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) the court extended Estelle to impose a duty upon the state to provide involuntarily committed mental patients "such services as are necessary to insure their 'reasonable safety' ... from others." DeShaney by First v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). We see no qualitative difference here where Young, by reason of his incarceration, is wholly dependent upon prison officials for protection and for sanitary housing.
 
 
 45
 Young has been placed in custody and consequently in peril if his custodians fail to both protect and care for him.
 
 
 46
 [I]t is the state's affirmative act of restraining the individual's freedom to act on his own behalf through incarceration, institutionalization, or other similar restraint of personal liberty which is the "deprivation of liberty" triggering the protections of the due process clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 
 
 47
 DeShaney, 489 U.S. at 200, 109 S.Ct. at 1006 (emphasis added). We agree with the United States Court of Appeals for the Seventh Circuit, which has applied the DeShaney decision to impose an affirmative duty upon a state to protect prisoners in its custody:
 
 
 48
 Although the Supreme Court has never held that the eighth amendment requires the state to protect prisoners from each other, the duty to do so is a logical correlative of the state's obligation to replace the means of self-protection among its wards. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 [109 S.Ct. 998, 103 L.Ed.2d 249] (1989); Archie v. Racine, 847 F.2d 1211 (7th Cir.1988) (in banc). A state with a constitutional duty to attend to prisoners' medical problems, even though the problems are not of the state's creation, Estelle v. Gamble, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976), has no lesser obligation to attend to the need for physical safety.
 
 
 49
 McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir.1991). See also Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia, 874 F.2d 156, 167 (3d Cir.1989) ("the state continues to owe an affirmative duty to protect those physically in its custody.")
 
 
 50
 Young has presented sufficient evidence to raise a genuine question of fact concerning the pervasive harm to which he was subjected, i.e., that the dangers he faced were sufficiently serious to satisfy the objective component of Wilson. The unrebutted facts before us clearly show that Young was preyed upon by each of a succession of cellmates. These fellow inmates subjected Young to sexual assault on several documented occasions, most likely because of Young's youthful appearance and slight stature.
 
 
 51
 Young has also presented sufficient, uncontested evidence to raise a genuine question of fact as to whether Lewisburg prison officials were deliberately indifferent to the inmates' repeated physical assaults on Young. See Frett, 839 F.2d at 978 (corrections officer's knowledge of risk that first inmate presented, and knowledgeable choice not to protect second inmate, precluded decision as a matter of law). After each assault, Young successfully notified but failed to get action from his jailers. After each attempt at notification, prison officials at various levels ignored his entreaties for protection, despite apparent knowledge that Young was the subject of continuous abuse. While not itself a basis for a claim, it is material to note by way of background that from the Bureau of Prisons' own statistics there were 4 inmate homicides at Lewisburg in 1988, and 29 confirmed inmate assaults. Throughout the federal prison system, which included 60 prisons, there were 8 homicides, and 292 confirmed assaults in 1988. In sum, while Lewisburg only had 2.8% of the U.S. prison population in 1988, it had approximately 10% of the inmate assaults and 50% of the inmate homicides. U.S. Department of Justice, Bureau of Prisons Summary Annual Report for 1988 (Oct. 7, 1988) (unpublished statistical report on file with the Bureau of Prisons, Northeast Region, Philadelphia, Pennsylvania). Thus, given the incidence of violence at Lewisburg, the prison authorities could not have lightly dismissed Young's allegations as improbable. Cf. Redman v. County of San Diego, 942 F.2d 1435, 1442 (9th Cir.1991).
 
 
 52
 Furthermore, Young told Keohane, Wells, Wagner, Steppie, Thomas, London, Radloff, Conrad, Spangler, and Bilger, several times that he was concerned for his safety and needed to be placed in protective custody. It is undisputed that these prison officials either did nothing, or their response, if any, came too late to be of any help to Young. These prison officials contend that Young informed them that he was in danger only once and that upon investigation they were unable to confirm Young's allegation. This position is challenged by appellee Thomas, who stated in his affidavit that Young voiced his concern about protective custody to the prison staff "on several occasions."
 
 
 53
 We conclude that a material dispute exists about the pervasive risk of harm to Young from other prisoners and the Lewisburg prison officials deliberate indifference to Young's legitimate complaints.[23] See Riley, 777 F.2d at 147-48. We hold that the district court erred by granting appellees' motion for summary judgment on Young's personal security claim, and that Young may proceed on this claim as to appellees Keohane, Wells, Wagner, Steppie, Thomas, Radloff, London, Conrad, Spangler, and Bilger.[24]
 
 2. Conditions of Confinement Claim
 
 54
 The district court concluded that confining Young to a dry cell was a legitimate punishment for flooding his cell and thus did not constitute cruel and unusual punishment. District Court Memorandum at 8. Young claims that this treatment far exceeded any reasonable disciplinary purpose. He claims that during the four day period when he was placed in a dry cell, prison officials permitted him to leave the cell to defecate only once, allowed him to empty his urinal only twice, failed to provide him with a plastic urinal for his first 29 hours of confinement, failed to provide him with toilet paper and water to drink, and did not allow him to wash his hands before eating.[25] We believe that Young has raised a genuine question of fact regarding the constitutionality of his confinement.
 
 
 55
 Inhumane prison conditions, including prolonged isolation in dehumanizing conditions, failure to provide adequate medical care, exposure to pervasive risks of physical assault, and unsanitary conditions have all been found to be cruel and unusual under contemporary standards of decency. See, e.g., Estelle, 429 U.S. at 104, 97 S.Ct. at 291 (1976) (medical care); Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570-71, 57 L.Ed.2d 522 (1978) (prolonged isolation in unsanitary, overcrowded cell); Riley v. Jeffes, 777 F.2d 143 (3d Cir.1985) (inmate security); Ramos v. Lamm, 639 F.2d 559 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (overcrowding, sanitation). At a minimum, a correctional institution satisfies its obligations under the Eighth Amendment when it furnishes prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. See Hassine v. Jeffes, 846 F.2d 169, 174 (3d Cir.1988); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.1982).
 
 
 56
 Segregated detention is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification. See Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir.1984); Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir.1969); Mims v. Shapp, 399 F.Supp. 818, 822 (W.D.Pa.1975). It may be a necessary tool of prison discipline, both to punish infractions and to control and perhaps protect inmates whose presence within the general population would create unmanageable risks. See Hutto, 437 U.S. at 685-86, 98 S.Ct. at 2570-71; O'Brien v. Moriarty, 489 F.2d 941, 944 (1st Cir.1974).
 
 
 57
 Courts, though, have universally condemned conditions of segregation inimicable to the inmate-occupants' physical health, and, in some instances, have also considered conditions that jeopardize the mental health or stability of the inmates so confined. The touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners. See Hutto, 437 U.S. at 685-87, 98 S.Ct. at 2570-71; Peterkin, 855 F.2d at 1029-30.
 
 
 58
 There is a fundamental difference between depriving a prisoner of privileges he may enjoy and depriving him of the basic necessities of human existence. Isolation may differ from normal confinement only in the loss of freedom and privileges permitted to other prisoners. See Owens-El v. Robinson, 442 F.Supp. 1368 (W.D.Pa.1978). The duration and conditions of segregated confinement cannot be ignored in deciding whether such confinement meets constitutional standards. Hutto, 437 U.S. at 686-87, 98 S.Ct. at 2571; Smith, 748 F.2d at 787.
 
 
 59
 We find that Young has alleged facts in his complaint that show that his conditions of confinement were sufficiently grave as to raise a claim under the Eighth Amendment. Young alleged that the following defendants violated his rights by actually subjecting him to unsanitary living conditions: Radloff and John Does 9 through 12. In their motion for summary judgment, appellees did not contest any of Young's factual allegations. Rather, they conceded that Young was placed in a dry cell and argued that such placement was a reasonable response to deter future similar behavior of Young. See, e.g., Pell v. Procunier, 417 U.S. 817, 826-827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).
 
 
 60
 While we agree with the district court that putting Young in a dry cell may have been a reasonable response to unwarranted flooding by Young, there is a serious question whether Young's act was precipitated by the official indifference to Young's safety concerns. Furthermore, we cannot condone dehumanizing treatment such as was allegedly given Young by Lewisburg prison officials once he was confined to the dry cell. Riley, 777 F.2d at 148 (where plaintiff's complaint alleges facts which, if proven, would entitle plaintiff to relief under the Eighth Amendment, dismissal of complaint was inappropriate). Even if Young was properly confined to the dry cell, Lewisburg officials do not have a license to impose unconstitutional conditions upon him. See Ingraham v. Wright, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977) (Eighth Amendment proscribes punishment grossly disproportionate to the severity of the crime); Sample v. Diecks, 885 F.2d 1099, 1108 (3d Cir.1989); United States v. Martorano, 866 F.2d 62, 69 (3d Cir.1989).
 
 
 61
 When viewed in their totality, the alleged actions of Lewisburg prison officials--not allowing Young to leave his cell more than once to defecate or urinate over a period of several days, not providing Young with a plastic urinal for 29 hours, not allowing Young to empty his urinal more than twice, not allowing Young to wash his hands before eating, not allowing Young to bathe or shower, not providing Young with toilet paper despite his diarrhea, not providing Young with water to drink, suggesting instead that he drink his urine, and the mocking taunts by guards and their threats to chain Young to a steel slab if he complained about his conditions--would if proved demonstrate a violation of the basic concepts of humanity and decency that are at the core of the protections afforded by the Eighth Amendment. It would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days in a stench that not even a fellow prisoner could stand.
 
 
 62
 The conditions that Young was allegedly made to endure for four days are all the more revolting considering that Young is HIV positive, and, hence, more susceptible to infection and disease. See Tillery, 907 F.2d at 428. Such a denial of even basic sanitation in our opinion is "cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose" Estelle, 429 U.S. at 103, 97 S.Ct. at 290. We find that Young has sufficiently alleged that the actions of certain Lewisburg prison officials "resulted in unquestioned and serious deprivation of basic human needs," Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399, and as such, Young has satisfied the objective component of a claim for violations of the Eighth Amendment.
 
 
 63
 That Lewisburg prison officials were deliberately indifferent to Young's requests for a minimal amount of relief from his squalor is also at issue. Indeed, appellees have adduced no evidence to rebut Young's allegation that prison officials were aware of his confinement to a dry cell, that they intentionally placed him in such a cell with full knowledge of his poor physical condition, and that once in the dry cell, the officials obdurately refused to allow Young to relieve himself with dignity, let alone adequate sanitation.
 
 
 64
 Summary judgment was erroneously granted as to Radloff. As one of the superior officers responsible for the dry cell, Radloff allegedly told his inferior officers that they should not provide Young with anything, and told Young that he "better not ask the officers for anything." With regard to John Does 9 through 12, Young has clearly stated an actionable claim, since the officers repeatedly denied Young's requests that he be allowed to leave his cell to defecate, that he be provided with a plastic urinal and that he be allowed to empty his urinal.
 
 
 65
 Young's uncontested factual allegations of the conditions in his cell and of the knowledge of such conditions by Lewisburg officials raise triable issues with respect to the violation of his Eighth Amendment rights. Therefore, summary judgment was inappropriate as to Radloff and John Does 9 through 12 at this stage of the litigation.[26]
 
 C. Motion to Compel Discovery
 
 66
 Consequent with its summary judgment, the district court dismissed Young's request for discovery as moot. District Court Order at 2. In light of our decision to reverse the district court's order granting summary judgment as to some Lewisburg defendants, we will also vacate the district court's order dismissing Young's motion to compel discovery. We note that Young has never had discovery in this matter.
 
 IV. CONCLUSION
 
 67
 We hold that the district court erred by dismissing the complaint as to defendant Radloff, and by granting summary judgment on the Eighth Amendment claims of adequate protection and conditions of confinement. As a consequence, we also will vacate the district court's order dismissing Young's request for discovery as moot. We will affirm the court's order in all other respects. In sum, we will reverse the district court order as to Keohane, Wells, Wagner, Steppie, Thomas, London, Radloff, Conrad, Spangler, Bilger, and John Does 9 through 12, affirm the rest, and remand for further proceedings.
 
 
 
 [1]
 Young's earlier 1983 action stemmed from two disciplinary hearings focussing on Young's behavior in response to his cellmates' assaults and sexual advances. He alleged his due process rights were violated in the first hearing when the hearing officer refused to produce a letter allegedly containing threats made by Young after his cellmate assaulted him, threatened to rape and kill him. The second disciplinary hearing, concerned Young's intentional flooding of his cell. Here he alleged that he was forced to proceed without a copy of the investigator's report. The district court dismissed Young's complaint as legally frivolous. We vacated the district court's order on the first disciplinary hearing because Young alleged facts sufficient to establish a due process violation. We affirmed the district court's order dismissing Young's claims arising from the second disciplinary hearing
 
 
 [2]
 Young describes himself as being small, young, white, and effeminate. He tested positive for the human immunodeficiency virus (HIV) while imprisoned, in February 1988
 
 
 [3]
 Apparently, this defendant's name is Roger "Cronrath." See Appellees' Brief at 10. We shall use the name used in Young's pleadings
 
 
 [4]
 Officer Diamond is not a defendant
 
 
 [5]
 Officer Marshall is not a defendant
 
 
 [6]
 Officer McDermott is not a defendant
 
 
 [7]
 Officer Troutman is not a defendant
 
 
 [8]
 Federal prisoners must ordinarily exhaust available administrative remedies before seeking injunctive relief in a Bivens action. See Waddell v. Alldredge, 480 F.2d 1078, 1079 (3d Cir.1973). If a federal prisoner seeks only money damages for violation of his constitutional rights, exhaustion of remedies is not required. See McCarthy v. Madigan, --- U.S. ----, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); Muhammad v. Carlson, 739 F.2d 122, 125 (3d Cir.1984). If, however, a prisoner's suit seeks both injunctive relief and damages, the exhaustion requirement ordinarily must still be met. See Veteto v. Miller, 794 F.2d 98, 100 (3d Cir.1986). In Young's case, he originally sought both injunctive and monetary relief. His request for injunctive relief has become moot since he no longer is incarcerated. Accordingly, we will not now require Young to exhaust administrative remedies
 
 
 [9]
 While it is our practice ordinarily to disregard "John Doe" claims absent a showing by the plaintiff that they are indispensable to the litigation, see generally Kiser v. General Electric Corp., 831 F.2d 423, 426 n. 6 (3d Cir.1987), we believe that Young has alleged sufficient facts to sustain his cause of action until he has completed discovery. See also Abels v. State Farm Fire & Casualty Co., 770 F.2d 26, 29 n. 3 (3d Cir.1985) ("The status of parties, whether formal or otherwise, does not depend upon the names by which they are designated, but upon their relation to the controversy involved, its effect upon their interests, and whether judgment is sought against them." quoting Grosso v. Butte Electric Ry. Co., 217 F. 422, 423 (D.Mont.1914))
 
 
 [10]
 The Seagoville defendants are: Charles Lewis, Seagoville Case Manager; Stan Ahlin, Seagoville Unit Manager; Jerry Blackburn, Seagoville Unit Manager; Frank Woods, Seagoville employee; W.L. Garrison, Seagoville Warden; and John Does 4 and 5, medical employees at the Federal Corrections Institute at El Reno, Oklahoma
 
 
 [11]
 The Bureau of Prisons ("BOP") defendants are: J. Michael Quinlan, Director of the Federal Bureau of Prisons; Kenneth Moritsugu, BOP Health Services Administrator; Wallace Cheney, BOP Deputy Assistant Director of Health; Charles Turnbo, BOP Northeastern Regional Director; John Doe 1, BOP South Central Regional Designator; and John Doe 2, BOP Northeastern Regional Director
 
 
 [12]
 The Lewisburg defendants are: George Thomas, Lewisburg Captain; Richard Wagner, case manager coordinator; John Steppie, case manager; Walter Wells, Associate Warden; Patrick Keohane, Warden; Officer Spangler, Senior SHU Officer; Vernon London, SHU Lieutenant; Lieutenant William Radloff, Supervisor of Special Housing Unit; Mr. Conrad (Lt. Roger Cronrath), SHU Lieutenant; Leroy Blanks, unit manager, Robert Zimany, case manager; Kenneth Kaufman, case manager; Officer Steven Bilger; Dr. Paulo DePretrillo, staff physician; Mr. Wiegand, physicians assistant; John Doe 3, Hospital Administrator; John Does 6, 8, and 14-21, physicians assistants; John Doe 7, the officer who arranged for Young to be housed with an inmate infected with hepatitis; John Doe 13, Assistant Hospital Administrator; and John Does 9 through 12, officers on duty when Young was incarcerated in the dry cell
 
 
 [13]
 In the letter, the inmate also threatened Young: "if you tried [sic] to come in the same recreation pen with me I would physically keep you out because of my fear of that shit (AIDS). Now I told Spangler and Lieutenant Conger about this, but they told me to do whatever I feel I had to."
 
 
 [14]
 The district court dismissed the complaint as to the Bureau of Prisons defendants because liability in a Bivens action cannot be based upon respondeat superior, citing Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Rizzo strictly is inapplicable because it involved liability under 42 U.S.C. § 1983. The Supreme Court has not decided the question of respondeat superior liability in Bivens actions. See generally Chemerinsky Federal Jurisdiction at 468 (1989 & 1990 Supp.). Most jurisdictions have decided against the applicability of respondeat superior liability in Bivens suits. See Dean v. Gladney, 621 F.2d 1331, 1334 (5th Cir.1980) (citing cases); but compare, Dellums v. Powell, 566 F.2d 216, 223 (D.C.Cir.1977)
 We do not reach this issue. Summary judgment was proper as to these defendants because, as discussed infra, Young has not shown that any of these defendants knew of either the inadequate protection afforded Young or the conditions of confinement in his dry cell. As such, these defendants could not, as a matter of law, be liable for Eighth Amendment violations under Wilson v. Seiter, --- U.S. ----, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).
 
 
 [15]
 Contrary to what Young alleged in his complaint, prison officials provided him with a disciplinary hearing. Young unsuccessfully challenged the legality of this disciplinary hearing in Young v. Kann, et al., 926 F.2d at 1405
 
 
 [16]
 Young's claim fails because an inmate has no reasonable expectation that he will be incarcerated in a particular prison. See Olim v. Wakinekona, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983); Montanye v. Haymes, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); Meachum v. Fano, 427 U.S. 215, 226, 96 S.Ct. 2532 (1976)
 
 
 [17]
 Young fails to support this claim with specific factual allegations. According to Rotolo v. Borough of Charleroi, 532 F.2d 920, 923 (3d Cir.1976), a complaint alleging civil rights violations must be pleaded with specificity. A court, however, should allow liberal amendment of civil rights complaints. See Wilson v. Rackmill, 878 F.2d 772, 774 (3d Cir.1989). In the two years since Young filed his complaint, the court provided him with ample opportunity to amend his complaint and plead additional facts to support this claim
 
 
 [18]
 We agree with the district court's conclusion that:
 [b]asically, [Young] is dissatisfied with the type of treatment he received in light of his being tested positive for the HIV virus. However, an inmate's disagreement with prison personnel over the exercise of medical judgment does not state a claim for relief. Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1080 (3d Cir.1976) ... In light of the record, the court does not believe a rational trier of fact could find that defendants were deliberately indifferent to this plaintiff's serious needs.
 District Court Memorandum at 8-9 (M.D.Pa. August 13, 1990); See also Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Consequently, the district court properly granted summary judgment in favor of those defendants involved solely in Young's claim for inadequate medical treatment: Dr. DePetrillo, Wiegand, John Does 3, 6, 8, and 13 through 21. Similarly, we find Young's claim against John Doe 7 to be without merit.
 
 
 [19]
 The district court also dismissed the complaint as to defendants Garrison, Blanks and Zimany for failure to effect service of process. We do not need to determine whether the court erred in this determination since we conclude that the court correctly granted summary judgment in their favor on other grounds. See note 14, supra
 
 
 [20]
 In determining whether a deprivation was sufficiently serious, a court must look at the totality of the conditions affecting an inmate. The Supreme Court has indicated that conditions of confinement, "alone, or in combination, may deprive inmates of the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2499 (emphasis added); See Union County Jail Inmates v. DiBuono, 713 F.2d 984 (3d Cir.1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984) ("The totality of circumstances relevant to this inquiry comprises all those circumstances that bear on the nature of the [food, clothing, shelter, sanitation, medical care, or protection] afforded to sentenced inmates."); but see contra Hoptowit v. Ray, 682 F.2d 1237, 1247 (9th Cir.1982) (restricting the totality of circumstances approach to specific conditions of confinement). In Young's case, we find that the totality of the conditions of his imprisonment, namely the protection and sanitation afforded to him, are sufficiently serious to satisfy the objective component of the Wilson Eighth Amendment analysis
 
 
 [21]
 When state of mind is an essential element of the nonmoving party's claim, resolution of the claim by summary judgment is often inappropriate because a party's state of mind is inherently a question of fact which turns on credibility. See International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1265 (5th Cir.1991); Miller v. FDIC, 906 F.2d 972, 974 (4th Cir.1990); National Fire Ins. Co. v. Turtur, 892 F.2d 199, 205 (2d Cir.1989); 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1437 (6th Cir.1987); see also 10A Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2730 (1983 & 1991 Supp.). In the context of claims arising under the Eighth Amendment, it has been said, "[S]tate of mind is typically not a proper issue for resolution on summary judgment." Wilson v. Seiter, 893 F.2d 861, 866 (6th Cir.1990), vacated on other grounds, --- U.S. ----, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)
 
 
 [22]
 "Deliberate indifference" has been variously described as: the possession of "actual knowledge of impending harm, easily preventable, so that a conscious, culpable refusal to prevent harm could be inferred from [a] failure to prevent it," Henderson v. De Robertis, 940 F.2d 1055, 1060 (7th Cir.1991); "the infliction of unnecessary suffering," Estelle, 429 U.S. at 103, 97 S.Ct. at 290; Lopez v. Robinson, 914 F.2d 486, 492 (4th Cir.1990); as the "unnecessary and wanton infliction of pain," Givens v. Jones, 900 F.2d 1229, 1232 (8th Cir.1990); and as the "knowledge ... of a pervasive risk of harm to inmates from other prisoners" and failure to respond reasonably to the risk, Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 560 (1st Cir.) cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988)
 
 
 [23]
 To be sure, prison officials are presented with an arduous task when asked to discern legitimate from illegitimate requests for protective custody:
 [i]n an ideal world, prisoners would request protective custody based on a sincere fear of physical harm upon which prison officials could rely. However, in a more realistic world, prisoners may feign their fear of physical harm simply to manipulate a transfer. The reasons vary for prisoners to use such fear as a ruse to obtain a transfer to dorm with a friend and/or to obtain better living quarters are examples. Therefore, when a prisoner requests a transfer because he fears for his life, prison officials are required to determine the credibility of his fear.
 Mullen v. Unit Manager Weber, 730 F.Supp. 640, 645 (M.D.Pa.1990). Prison officials, therefore, are not required to provide protective custody to every inmate who asserts he was assaulted or threatened. Nonetheless, prison officials should, at a minimum, investigate each allegation of violence or threat of violence. Cf. Riley, 777 F.2d at 146-48.
 
 
 [24]
 In so holding, we do not foreclose the possibility that the number of potentially liable defendants may increase or decrease after discovery
 
 
 [25]
 Young's complaint alleged that the following defendants violated his rights by "permitting condoning and applauding plaintiff's placement" in the dry cell: Warden Keohane, Associate Warden Wells, Captain Thomas, Lieutenant London, Lieutenant Radloff, Lieutenant Conrad, and other unknown defendants. Young, however, did not allege that any of the above defendants, other than Radloff and John Does 9 through 12, actually knew or should have known of Young's placement in the cell. Accordingly, the district court correctly granted summary judgment as to Keohane, Wells, Thomas, London, Conrad and other unknown defendants on Young's conditions of confinement claim
 
 
 [26]
 Again, we do not foreclose the possibility that the number of defendants answerable on this claim may increase or decrease after discovery