Antti John HAAVISTO, Respondent,

v.

Rudy PERPICH, individually and as Governor of the State of Minnesota, et al., Defendants,

Orville B. Pung, individually, and as Corrections Commissioner of the State of Minnesota, et al., Appellants (C0–92–1719),

Dr. James Allan, individually and as Medical Director of the Minnesota State Prison at Stillwater, Appellant (C7–92–1720).

Nos. C0–92–1719, C7–92–1720.

Court of Appeals of Minnesota.

April 13, 1993.

Review Granted June 9, 1993.

Marcy S. Wallace, John C. McNulty, Charlotte M. Reed, McNulty & Wallace, St. Paul, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Richard S. Slowes, Asst. Solicitor Gen., St. Paul, for appellants (C0–92–1719).

Timothy R. Murphy, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for appellant (C7–92–1720).

Considered and decided by NORTON, P.J., and SHORT and MULALLY,* JJ.

## OPINION

SHORT, Judge.

This case arises out of the tuberculosis epidemic at the Minnesota Correctional Facility at Stillwater (prison) in the mid–1980s. Antti Haavisto alleges the diagnosis of his active tuberculosis was unnecessarily delayed by the prison health care system and in particular, by the conduct of Dr. James Allan (physician). A federal counterpart case was litigated as a class action for injunctive relief. *See generally DeGidio v. Pung*, 704 F.Supp. 922, 957 (D.Minn.1989) (prison officials' inadequate response to tuberculosis epidemic violated inmates' Eighth Amendment rights), *aff'd*, 920 F.2d 525 (8th Cir.1990). After a lengthy trial, the federal court found the response to the tuberculosis outbreak at the prison consisted of a series of negligent and reckless acts exhibiting deliberate indifference to inmates' serious medical needs. *Id.* at 959; *DeGidio*, 920 F.2d at 528. Despite its conclusion, the federal court declined to issue an injunction because the constitutional violations already had been remedied. It left all damage claims for trial in state court.

The state cases venued in Washington and Ramsey Counties were consolidated. The trial court certified a class and approved a settlement as to all claims except Haavisto's. The trial court's order specifically allowed Haavisto to proceed individually. The parties filed cross-motions for summary judgment. After the trial court

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

ruled on those motions, only medical malpractice claims against the physician and Eighth Amendment claims based on 42 U.S.C. § 1983 (1981) against Orville B. Pung (commissioner), Robert C. Erickson (warden), and the physician remained.

On appeal, the commissioner, warden, and physician argue they are entitled to qualified immunity from Haavisto's section 1983 claims as a matter of law; Haavisto argues the doctrine of collateral estoppel prevents relitigation of liability issues. We reverse and grant immunity to the commissioner and warden on Haavisto's section 1983 claims. As there are fact issues in dispute regarding the physician's medical care of Haavisto, we remand the section 1983 claims against the physician for trial with the medical malpractice claims against him.

## FACTS

Haavisto was ill when he entered prison in late March 1982. During his intake screening and physical, prison medical personnel examined Haavisto and administered a standard tuberculosis skin test and a chest X-ray. Haavisto complained during that examination of pulmonary symptoms. The results of the skin test were positive. Without knowledge of the positive results, a radiologist read the X-ray as demonstrating no lung abnormalities. Over the next few months, Haavisto made several visits to the prison health services unit and complained about coughing and chest pains. Prison medical personnel performed additional X-rays and prescribed antibiotics. They did not consider active tuberculosis. When a third X-ray indicated Haavisto had pneumonia, the physician prescribed penicillin.

On October 14, 1982, Haavisto complained to the physician that he was coughing up blood. Prison medical personnel performed a sputum test, but did not take additional X-rays until October 25. While reading the new X-rays, a radiologist noted symptoms consistent with tuberculosis. Haavisto was transferred to St. Paul Ramsey Medical Center. Further examination showed active tuberculosis. Haavisto was placed in respiratory isolation and given anti-tuberculosis drugs. After his treatment, Haavisto was transferred back to prison where he continued a chemotherapy regimen. He was released from prison in May 1983. Haavisto was the first case of active tuberculosis at the prison in ten years.

## ISSUES

I. Are the commissioner, the warden and the physician collaterally estopped from litigating liability issues?

II. Is the commissioner, the warden or the physician entitled to qualified immunity from Haavisto's Eighth Amendment claims under 42 U.S.C. § 1983?

## ANALYSIS

■ On appeal from a grant of summary judgment, this court determines whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn. 1989). We need not defer to the trial court's determination of legal issues. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

■ The application of qualified immunity is a question of law that should be decided by a court "long before trial." *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *see also Johnson v. Morris*, 453 N.W.2d 31, 40 (Minn.1990) (issue of qualified immunity is appropriately resolved on summary judgment). The scope of the qualified immunity doctrine is broad. It is an immunity from suit, not simply a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). As the doctrine of qualified immunity has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

I.

Haavisto argues qualified immunity is unavailable to the commissioner, warden, and physician as a matter of law because the class certification order and final judgment in the federal case prevent relitigation of liability issues. We disagree. Collateral estoppel precludes parties from relitigating issues which are identical to issues previously litigated and which were necessary and essential to the former resulting judgment. *Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn.1990) (citing *Ellis v. Minneapolis Comm'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn.1982)). Collateral estoppel may be invoked in a subsequent litigation if four criteria are satisfied:

> (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Oldham v. Pritchett*, 599 F.2d 274, 279 (8th Cir.1979); *Aufderhar*, 452 N.W.2d at 650; *Ellis*, 319 N.W.2d at 704.

The federal court specifically dismissed the physician without prejudice and without any res judicata or collateral estoppel effect on the state cases. Thus, with respect to the physician, the federal court's order is not a final judgment for purposes of issue preclusion. *See In re Piper Aircraft Distribs. Sys. Anti–Trust Litig.*, 551 F.2d 213, 220 (8th Cir.1977) (element of finality is lacking when a party has been dismissed without prejudice). In addition, the physician has not had a full and fair opportunity to litigate issues involving his care of Haavisto. While he provided testimony as a subpoenaed fact witness in the federal trial, neither he nor his attorney participated in the federal case. To deny the physician an opportunity to litigate liability issues would deny him due process of law. *See Blonder–Tongue Labs. Inc. v. University of Ill. Found.*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) (due process prohibits estopping parties who never have had a chance to present their evidence and arguments on a giv-

en claim); *Kohler v. State Farm Mut. Auto Ins. Co.*, 416 N.W.2d 469, 472 (Minn. App.1987) (collaterally estopping a nonparty to a previous litigation would deny that party due process); *see generally* James R. Pielemeier, *Due Process Limitations on the Application of Collateral Estoppel Against Nonparties to Prior Litigation*, 63 B.U.L.Rev. 383, 420 (1983) (due process in civil litigation requires an opportunity for a hearing on the merits).

The federal court rulings also do not preclude litigation of liability issues by the commissioner or the warden for two reasons. First, the federal court did not address issues of individual responsibility. *See, e.g., McDuffie v. Estelle*, 935 F.2d 682, 690 n. 17 (5th Cir.1991) (general finding of prison's Eighth Amendment violations in action for declaratory and injunctive relief does not have preclusive effect on issue of individual official's constitutional wrongdoing); *Crowder v. Lash*, 687 F.2d 996, 1011 (7th Cir.1982) (same); *Bogard v. Cook*, 586 F.2d 399, 408–09 (5th Cir.1978) (same), *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). Second, the federal court did not consider the qualified immunity defense, and its findings of constitutional violations thus do not address a defense of qualified immunity. Immunity generally is not available as a defense in actions for injunctive relief. *Wood v. Strickland*, 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975); *see McDuffie*, 935 F.2d at 687 (incentive to oppose injunction sought in previous litigation was not strong enough to require application of collateral estoppel); *Crowder*, 687 F.2d at 1011 & 1011 n. 15 (even if conditions of confinement are held to constitute cruel and unusual punishment, defendants are entitled to prevail on qualified immunity grounds if they can show plaintiff's Eighth Amendment right to be free from the "cruel and unusual" conditions was not clearly established during the time he was incarcerated); *Bogard*, 586 F.2d at 409 (problem of qualified immunity not injected into suit until damage relief sought against officials in their individual capacity). *But see Williams v. Bennett*, 689 F.2d 1370, 1385 (11th Cir.1982) (if defendants should have known their conduct in maintaining an un-

constitutional prison violated plaintiff's rights, their qualified immunity or good faith defense will be defeated), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

Because the issues of personal responsibility and qualified immunity were not litigated in the federal action, collateral estoppel cannot be invoked by Haavisto to prevent the commissioner, warden, and physician from litigating liability issues.

## II.

 All persons who, under color of law, subject any other person to the deprivation of any constitutional right shall be liable to the injured party. 42 U.S.C. § 1983 (1981). Parties injured by constitutional abuses are entitled to recovery of money damages. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971). Haavisto brought this civil rights action under 42 U.S.C. § 1983 claiming the seven-month delay in diagnosing his active tuberculosis subjected him to cruel and unusual punishment in violation of the Eighth Amendment. Deliberate indifference to an inmate's serious medical needs violates his or her Eighth Amendment rights. U.S. Const. amend. VIII; *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). However, not every claim by an inmate of inadequate medical treatment rises to the level of a constitutional violation. *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291. More than ordinary negligence or medical malpractice is necessary to prove a violation of the Eighth Amendment. *Id.* at 105–06, 97 S.Ct. at 292.

 Even if Haavisto's section 1983 allegations raise factual issues which normally would require jury resolution, summary judgment may still be appropriate if the commissioner, warden or physician enjoys qualified immunity from suit for his actions. Qualified or "good-faith" immunity is an affirmative defense available to public officials sued for damages under section 1983. *Elwood v. County of Rice*, 423 N.W.2d 671, 674 (Minn.1988) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)).

Whether qualified immunity exists turns on whether the official violated a clearly established statutory or constitutional right, the existence of which a reasonable person would have known. *Id.* at 674–75. The inquiry is confined to whether a reasonable public official would have known the act was in violation of those rights. *Id.* at 675. Qualified immunity should be recognized even if public officials of reasonable competence could disagree on the issue. *Id.* Haavisto argues the doctrine of qualified immunity is unavailable to the commissioner, warden, and physician because: (a) the commissioner and warden ignored deficiencies in the prison medical system; and (b) the physician provided grossly inadequate medical care.

### A. The Commissioner and the Warden

 We must determine whether reasonably competent prison officials would have known their actions or inactions constituted deliberate indifference to Haavisto's serious medical needs. The proper inquiry is whether the officials acted reasonably, not whether a more reasonable interpretation of the events could later be constructed. *Hunter*, —— U.S. at ——, 112 S.Ct. at 537. The commissioner and warden argue they were entitled to rely on medical professionals for clinical determinations. We agree. Haavisto sought and received medical care from the prison health services unit more than thirty times over a four-month period. *See Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir.1981) (no federal constitutional question was presented when inmate followed established prison procedures for obtaining medical treatment and received it). A reasonable prison official is entitled to rely on medical professionals to make appropriate clinical determinations. *See Limbert v. Umar*, 585 F.Supp. 1413, 1414 (E.D.Pa.1984) (difference of medical opinion does not equal "deliberate indifference" to inmate's serious medical needs). In relying on the prison's medical professionals for clinical determinations, the commissioner and warden did not knowingly violate Haavisto's clearly established Eighth Amendment rights. *See Benson v. Cady*, 761 F.2d 335, 341–42 (7th Cir.1985) (inmate's bare legal conclusion

that prison officials were deliberately indifferent to his serious medical needs will not suffice for constitutional claim). In March 1982 no reasonable prison official could have known the actions of the prison's medical personnel would lead to a delay in detecting a contagious disease not seen in the prison in over ten years.

According to Haavisto, both the 1973 consent decree in the *Hines* case, *Hines v. Anderson,* 439 F.Supp. 12 (D.Minn.1977), and the findings of fact from the federal case demonstrate the commissioner's and the warden's knowledge of deficiencies in the prison health care system and defeat their claim to qualified immunity. We disagree. As the United States Court of Appeals for the Eighth Circuit noted, a consent decree may be extremely detailed and provide relief far beyond constitutional requirements. *DeGidio,* 920 F.2d at 534. Thus, whether the consent decree's mandates were followed to the letter does not assist the inquiry of whether constitutional rights were violated in a manner that defeats qualified immunity. *Hines'* primary focus was the prison infirmary, which used to function as a hospital. *DeGidio,* 704 F.Supp. at 929; *see Hines,* 439 F.Supp. at 19–20 (discussing in detail conditions of prison infirmary). Under the *Hines* consent decree, prison officials began the practice of transferring inmates to an off-site hospital for inpatient care. *Id.* at 19. Haavisto's claim is not based on a failure to provide care due to inadequate medical facilities, but rather on the seven-month delay in diagnosing his active tuberculosis. The 1973 consent decree provides no basis for reasonable prison officials to suspect that prison medical personnel would fail to diagnose an inmate's active tuberculosis in 1982.

In addition, though the federal court found the government deliberately indifferent to Haavisto's welfare, it made no specific findings concerning either the warden or the commissioner's individual responsibility for or knowledge of constitutional deficiencies at the prison in 1982. Concerning Haavisto's treatment, the federal court stated:

In sum, the supervisors and medical staff demonstrated inattention and deliberate indifference to Haavisto's welfare and that of inmates and staff with whom he had contact.

*DeGidio,* 704 F.Supp. at 937. The federal court also found:

Perhaps the most obvious example of wanton neglect of an inmate's basic medical needs is the medical treatment provided to inmates Haavisto and Graham. * * * In each case the diagnosis of tuberculosis appears not to have been made until well after that illness should have been diagnosed by a physician exercising reasonable care and the degree of skill normally possessed by physicians in similar practice. * * * [T]he record shows that he [Haavisto] was subjected to unnecessary pain and suffering.

*Id.* at 957. While those findings are critical of government officials, only the physician is singled out. The federal court, however, specifically permitted the physician to litigate his liability in state court. The federal court made no findings that the warden or commissioner were themselves deliberately indifferent to Haavisto's medical needs.

Haavisto's case was the first case of active tuberculosis at the prison in ten years. The prison officials did not have the benefit of the federal court's extensive factual findings in 1982 when Haavisto first presented himself to prison medical personnel. We cannot require the commissioner and the warden to anticipate a situation they had no reasonable cause to suspect in March 1982. We conclude reasonably competent prison officials would not have known their reliance on medical professionals could constitute deliberate indifference to Haavisto's serious medical needs.

### B. The Physician

The physician argues Haavisto's claims against him lack a constitutional dimension and sound in common-law medical malpractice instead. The record demonstrates: (1) Haavisto told the physician he thought he had tuberculosis, but the physician did not order a sputum test until much later; (2) Haavisto's medical expert alleges the physician made no attempt to acquaint himself with diseases likely to arise in a prison

setting; and (3) the physician viewed his position at the prison as a part-time job and habitually was unavailable to the inmates.

 In the context of Haavisto's Eighth Amendment claim for the denial of adequate medical care, qualified immunity will shield the physician from civil liability only as long as the physician's actions reasonably could have been thought to be consistent with the rights he is alleged to have violated. *Givens v. Jones*, 900 F.2d 1229, 1231–32 (8th Cir.1990). Reasonably competent public officials should know the law governing their conduct. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738. Here, the evidence raises the question of whether a reasonably competent physician would have diagnosed Haavisto's active tuberculosis, and whether the physician's actions were done with deliberate indifference to Haavisto's Eighth Amendment rights. We thus cannot say on this record that qualified immunity protects the physician from civil liability to Haavisto. When viewed in a light most favorable to Haavisto, these disputed facts prevent either summary judgment in the physician's favor or a basis for qualified immunity. *See, e.g., Rogers v. Evans*, 792 F.2d 1052, 1062 (11th Cir.1986) (disputed factual issues prevented summary judgment as to Eighth Amendment allegations against prison psychologist); *Kelsey v. Ewing*, 652 F.2d 4, 5–6 (8th Cir. 1981) (inmate's allegations that he was still bleeding from surgery incisions when he was returned to prison, that he was kept in lock-up in unhealthful living conditions and was denied a medically-prescribed diet, that he was denied information about a heart condition, that he was refused an examination of his swollen leg following surgery, that he had been given false information by physician, and that physician had violated the confidentiality of his medical records were more than sufficient to state a constitutional claim; accordingly, his complaint was sufficient to survive a motion for dismissal). Haavisto's section 1983 action against the physician must be evaluated by a finder of fact.

### DECISION

Because both the individual responsibility of the commissioner, the warden, and the physician and the applicability of qualified immunity to their actions were not actually litigated in the federal case, collateral estoppel does not bar litigation of those issues in the present case. The commissioner and warden were entitled to rely on prison medical personnel for clinical determinations; their reliance was reasonable and did not violate any known right. Accordingly, qualified immunity applies to bar Haavisto's section 1983 claim against them. With respect to the physician, however, there are disputed fact issues as to whether he acted unreasonably or inconsistently with Haavisto's Eighth Amendment rights. Thus, summary judgment in the physician's favor is premature.

**Reversed in part and affirmed in part.**

NORTON, Judge (concurring in part and dissenting in part),

I must respectfully dissent as to part II.A. of the majority opinion. The warden and the commissioner should not be protected by qualified immunity for their actions or, more accurately, their alleged inactions.

Proper consideration of this case requires a more detailed exposition of the relevant facts. In 1973, a class of Stillwater state prison inmates brought suit to improve medical care at the prison. After lengthy litigation, the parties agreed to a consent decree laying out rules and responsibilities for prison officials. *Hines v. Anderson*, 439 F.Supp. 12 (D.Minn.1977). Among the elements of the 1977 consent decree were the following:

● Upon entering the prison, each inmate must receive a full physical examination including a Mantoux test for tuberculosis. *Id.* at 17.

● Each inmate has the right to be "examined, diagnosed and treated, at their personal expense, by a private physician." *Id.* at 18.

● There shall be a single administrative chief of medical services who shall oversee and be responsible for the overall health care program at the Minnesota State Prison. To the extent possible, this

administrative chief shall have no other duties imposed upon him, his primary responsibility being the administration of health care for inmates.
*Id.*

● A full-time physician must be made available. *Id.*

● Inmates who are found to be infected or evidencing contagious diseases or conditions shall be isolated or segregated from other inmates according to acceptable standards of medical care, until said contagious disease or condition shall have abated.
*Id.* at 23.

The terms of the consent decree were mandatory, and the officials and their successors were enjoined from failing to carry out its provisions. *Id.* at 24. (The warden and the commissioner are successors to the officials in *Hines.*)

On March 29, 1982, Haavisto was transferred to the Stillwater Prison from the county jail at Wadena. He was given a physical examination, including a Mantoux test and chest x-ray. The test reported positive for tuberculosis infection, but the radiologist, who had no knowledge of the results of this test, examined the chest x-ray and reported no abnormalities. Although Haavisto told his examiners about his constant coughing, he was given no treatment for his condition and his complaints were not investigated. The following excerpt from Judge Murphy's opinion details the rest:

> His complaints of coughing and chest and back pain were persistent. The health services personnel and guards had instructions from Dr. Allan to give him cough drops when he needed them. Haavisto was sometimes not permitted to report to sick call. On several occasions when he reported, Dr. Allan was absent and the appointment was cancelled. Dr. Allan insists that each of Haavisto's pulmonary symptoms from April through November 1982, was a discrete episode which resolved with treatment.

> Haavisto would awaken during the night with severe coughing spells. This would wake other inmates who would make angry remarks and threats. His respiratory problems were so well-known that others worried about being infected by him. Sergeant Marty Lopez was instructed by his supervisor to keep alcohol and rags on the cell block to wipe off the phone after Haavisto used it. In the early mornings and before each meal, it was Haavisto's habit to lie on his stomach for up to an hour to cough up as much sputum as he could so that he could eat in the dining hall without calling attention to his coughing. Haavisto suffered intimidation from fellow inmates who accused him of spreading disease. He testified that he feared for his life. Because of threats he kept to himself for several months prior to the diagnosis of active tuberculosis.

> Other inmates in his cell hall (AEU) became irritated and alarmed about his coughing and spitting. They complained to Haavisto, to the guards, and among themselves that he might have tuberculosis. The guards' union confronted the administration about possible tuberculosis among inmates, and several guards were tested by private physicians. In spite of all this, tuberculosis was not considered by the prison health services until October 1982. In sum, the supervisors and medical staff demonstrated inattention and deliberate indifference to Haavisto's welfare and that of inmates and staff with whom he had contact.

> Over the summer of 1982 Haavisto requested the opportunity to see a private physician. The request was denied even though he agreed to be financially responsible.

*DeGidio v. Pung*, 704 F.Supp. 922, 937 (D.Minn.1989). Judge Murphy also found that no person was responsible for the "efficient delivery of health care," *id.* at 950, and that no one accepted any "ultimate responsibility for directing the effort at controlling tuberculosis." *Id.* at 957–58.[1]

---

**1.** I agree with the majority that Haavisto may not use the findings of Judge Murphy to collaterally estop appellants from litigating these fac-

tual issues. *Supra*, at 750–751. I cite Judge Murphy's findings only to demonstrate that evi-

Public officials are entitled to the affirmative defense of qualified immunity unless "the officials' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Elwood v. County of Rice,* 423 N.W.2d 671, 674–75 (Minn.1988) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Emphasis is placed on "clearly": if the alleged acts of the officials were reasonable under settled law at the time of the acts, there is no liability. *Hunter v. Bryant,* — U.S. —, —, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

The majority would grant qualified immunity to the warden and commissioner because "they were entitled to rely on medical professionals for clinical determinations." *Supra,* at 751. In doing so, however, I believe that the majority focuses on the wrong conduct. Haavisto is not suing corrections officials because they unreasonably relied on Dr. Allan's multiple misdiagnoses. Rather, he sues because the officials failed to take mandatory steps that could have prevented the long series of misdiagnoses. *See Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) ("[D]eliberate indifference to inmates' health needs may be shown by * * * proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."). The prison had no individual with supervisory responsibility for the health care system, the prison had no full-time physician who could be fully responsible for inmates' care, Haavisto was denied the opportunity to visit a private physician, and the prison had no procedures for containing infectious diseases. All of these were in violation of the five-year-old *Hines* consent decree, of which the warden and commissioner were aware and which constituted the relevant law for guiding their actions. In addition, plausibly because prison guards had no training in recognizing situations that demanded infectious disease control, Haavis-to was continuously harassed by both guards and inmates.

Put another way, the warden and commissioner cannot reasonably rely on the opinions of medical professionals simply because, contrary to the mandates of the *Hines* decree, they failed to put in place medical personnel and procedures upon whom they *could* reasonably rely. Along with Judge Murphy, I believe that enough deliberate indifference has been shown to allow a trial against the warden and commissioner. I would affirm the trial court.

dence exists sufficient to withstand summary judgment and dispute qualified immunity.