Antti John HAAVISTO, Appellant,

v.

Rudy PERPICH, individually and as Governor of the State of Minnesota; et al., Defendants,

Orville B. Pung, individually and as Corrections Commissioner of the State of Minnesota; et al., Respondents,

Dr. James Allan, individually and as Medical Director of the Minnesota State Prison at Stillwater, Appellant.

Nos. C0–92–1719, C7–92–1720.

Supreme Court of Minnesota.

Aug. 19, 1994.

Rehearing Denied Oct. 13, 1994.

John C. McNulty, Marcy S. Wallace, Charlotte M. Reed, McNulty & Wallace, St. Paul, for Haavisto.

Timothy R. Murphy, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for Allan, et al.

Hubert H. Humphrey, III, Atty. Gen., Richard S. Slowes, Asst. Atty. Gen., St. Paul, for respondents.

## OPINION

WAHL, Justice.

Antti John Haavisto, in appeal C0–92–1719, asks us to decide whether the defense of qualified immunity applies, as a matter of law, to bar his 42 U.S.C. § 1983 claim of constitutionally inadequate medical care while he was an inmate at Minnesota Correctional Facility at Stillwater (Stillwater) against Commissioner of Corrections Orville Pung and Stillwater Warden Robert Erickson. Specifically, Haavisto claims that a delayed diagnosis of tuberculosis deprived him of his constitutional rights under the Eighth Amendment to the United States Constitution. We reach the qualified immunity issue only if we affirm the decision of the court of appeals that the commissioner, the warden, and the medical director, Dr. James Allan, are not collaterally estopped from litigating liability issues in this case by a federal district court decision involving the same incidents.

Dr. James Allan, medical director at Stillwater, appeals from the holding of the court of appeals affirming the trial court's finding that Allan is not entitled at this time to

summary judgment based on qualified immunity because there are disputed factual issues as to whether his conduct violated Haavisto's Eighth Amendment rights.

Haavisto entered Stillwater on March 29, 1982. During the relevant period, Orville Pung was the Deputy Commissioner of Corrections and Robert Erickson was the warden at Stillwater. Pung had complete supervisory responsibility at Stillwater, and Erickson had overall administrative responsibility for health care services. The St. Paul Ramsey Medical Center (SPRMC) and Ramsey Clinic Associates (RCA), who had a contract with the State of Minnesota, hired Allan in August, 1981. From August of 1981 through early 1985, Allan was the only physician providing medical care at Stillwater. The trial court found that Allan was acting under color of state law when fulfilling RCA's contractual obligation to provide medical care. Allan divided his time about evenly between the prison and a family practice clinic where he carried a full patient load.

In 1984, Haavisto was a named representative of a class which sought declaratory and injunctive relief as well as $40 million in damages for alleged constitutional deficiencies in the treatment and control of the tuberculosis epidemic at Stillwater. The defendants included the three current defendants, Pung, Erickson, and Allan, as well as the State of Minnesota, Governor Rudy Perpich, and Commissioner of Health Sister Mary Madonna Ashton, who were later dismissed.

Haavisto was also a named representative in a federal action involving the tuberculosis epidemic commenced at the same time as the state case. *See DeGidio v. Pung,* 704 F.Supp. 922 (D.Minn.1989); 723 F.Supp. 135 (D.Minn.1989), *aff'd,* 920 F.2d 525 (8th Cir. 1990). By order dated June 12, 1985, the federal district court certified a class for purposes of the injunctive relief claim, but denied class certification for damage claims, stating that "individuals will be required to present evidence of causation and their particular damages separately." *DeGideo v. Perpich,* 612 F.Supp. 1383, 1387 (D.Minn. 1985). Allan was dismissed from the federal action prior to trial "without prejudice or any res judicata or collateral estoppel effect on any pending state action."

By order dated May 30, 1986, the Washington County District Court certified a class for purposes of injunctive relief in the state case, but denied class certification for damages claims. The state case was stayed pending the federal trial.

After a trial in federal district court, the Honorable Diana E. Murphy entered judgment for the defendants. Although the court found that the defendants' response to the tuberculosis epidemic violated the inmates' Eighth Amendment rights, it did not grant injunctive relief because prison conditions by the time of the judgment were no longer so deficient as to violate constitutional requirements. *DeGidio,* 704 F.Supp. at 950 (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). On post-trial motion, the court awarded the class $210,303 in attorney fees from the defendants in their individual capacities. *DeGidio,* 723 F.Supp. at 140.

The federal district court in *DeGidio* made detailed factual findings about the prison and a number of inmates, including Haavisto. Although not findings of fact in this case, the facts do correspond to those alleged by Haavisto and were in the trial court record below. The federal district court described the relevant period of Haavisto's incarceration as follows:

[Haavisto] entered Stillwater as an inmate on March 29, 1982. As part of the regular intake process at the prison, he was given a cursory medical examination by a nurse. The examination included a Mantoux test and chest x-ray. The Mantoux test was positive. The radiologist read the chest x-ray as negative; he noted that it demonstrated no lung abnormalities. This suggested an absence of active tuberculosis. The x-ray was apparently read without the clinical chart present, however, and the radiologist did not know Haavisto's Mantoux status. During his intake exam, Haavisto informed the health services personnel of pulmonary symptoms he experienced while he was incarcerated at the Wadena County Jail from January of 1982. He fell ill while he was at the

local jail, and after arriving at Stillwater he speculated that he had tuberculosis. An antibiotic was prescribed by health services, and his comments about tuberculosis were apparently ignored.

He returned to health services repeatedly. On May 16, 1982, he requested a decongestant. On May 17, 1982, he reported an upper respiratory infection; penicillin was prescribed. On May 25, 1982, he again presented himself to health services complaining of an upper respiratory infection; amoxicillin was prescribed. Before June 30, 1982, Haavisto was seen two more times at health services with respiratory complaints; various treatments were prescribed. A blood count and chest x-ray were ordered on June 22. The x-ray was reported by the radiologist as mild pulmonary emphysema. Between June 30 and August 4, the medical chart reflects three more visits to health services. None of the entries of Haavisto's chart indicate respiratory problems; Haavisto testified, however, that his pulmonary problems were persistent. He had several x-rays taken through July 1982. None of his x-ray reports or medical record note the possibility of tuberculosis.

His complaints of coughing and chest and back pain were persistent. The health services personnel and guards had instructions from Dr. Allan to give him cough drops when he needed them. Haavisto was sometimes not permitted to report to sick call. On several occasions when he reported Dr. Allan was absent and the appointment was cancelled. Dr. Allan insists that each of Haavisto's pulmonary symptoms from April through November 1982, was a discrete episode which resolved with treatment.

Haavisto would awaken during the night with severe coughing spells. This would wake other inmates who would make angry remarks and threats. His respiratory problems were so well-known that others worried about being infected by him. Sergeant Marty Lopez was instructed by his supervisor to keep alcohol and rags on the cell block to wipe off the phone after Haavisto used it. * * *

Other inmates in his cell hall (AEU) became irritated and alarmed about his coughing and spitting. They complained to Haavisto, to the guards, and among themselves that he might have tuberculosis. The guards' union confronted the administration about possible tuberculosis among inmates, and several guards were tested by private physicians. In spite of all this, tuberculosis was not considered by the prison health services until October 1982. * * *

Over the summer of 1982 Haavisto requested the opportunity to see a private physician. The request was denied even though he agreed to be financially responsible. * * * [The court found this to be a violation of the "Patient's Bill of Rights," incorporated in the consent decree in *Hines v. Anderson,* 439 F.Supp. 12, 18 (D.Minn.1977), which states that inmates have a right to consult with private physicians.] At one point in the summer of 1982, Haavisto attempted to obtain a chest x-ray without the approval of Dr. Allan. Dr. Allan intervened and would not permit the x-ray to be taken, accusing Haavisto of wasting state money.

Haavisto reported to sick call on October 14, 1982. He reported that his back and chest pain persisted and that he was coughing up blood. Haavisto was not isolated, nor were further x-rays taken until October 25, 1982. Dr. Allan did order a sputum test, however. It was at this point that tuberculosis was apparently first considered. Haavisto was returned to the cell hall and not isolated. He was required to wear a face mask and discouraged from undertaking any activity which might spread infection from air droplets.

When his October 25 x-ray was read, the Stillwater radiologist noted for the first time an infiltrate in the left lung consistent with tuberculosis disease. He had earlier noted possible pneumonia or emphysema, but never tuberculosis. On October 29, 1982, Haavisto was sent to SPRMC and placed in an isolation unit. His sputum smear was returned on November 1, 1982, and was found to be positive with many acid fast bacilli. He was thereafter consid-

ered to be a bacteriologically confirmed active case. * * *

The pulmonary medicine department of SPRMC compiled a medical history of Haavisto's symptoms from before his entry into Stillwater. The physicians reviewed a series of x-rays, beginning with his Stillwater entry x-ray from April 1982. The SPRMC radiologist noted that the tuberculosis infiltrate was evident as far back as April 1982. * * * His medical history taken at SPRMC indicated that at the time of his diagnosis, he was producing approximately one and one-half cups of sputum per day. Haavisto testified that throughout the summer of 1982 he was coughing up "mud" and had been reporting this to the medical service.

*DeGidio*, 704 F.Supp. at 936–38.

The *DeGidio* decision referred to *Hines v. Anderson*, 439 F.Supp. 12 (D.Minn.1977) in which a consent decree was entered between a class of Stillwater inmates and several defendants, including the commissioner and the Stillwater warden. Included in the decree was the agreement of the commissioner and warden to hire a full-time doctor, adequate medical support staff, and to provide an administrative chief of medical services who would be responsible for the administration of health care in the prison.

Following the federal district court trial in *DeGidio*, another group of inmates commenced an action in Ramsey County District Court. The state cases, venued in Washington and Ramsey counties, were consolidated in Washington County for class settlement. The court approved a settlement with respect to all claims except Haavisto's claim. Haavisto requested and was allowed to proceed individually.

All parties filed cross-motions for summary judgment. The trial court dismissed all claims except the medical malpractice claim and the Eighth Amendment claims based on 42 U.S.C. § 1983 against Allan, and the § 1983 claims against Pung and Erickson. Haavisto's motion for partial summary judgment as to liability was denied.

The court of appeals reversed the trial court and held (2–1) that Pung and Erickson were entitled to qualified immunity as a matter of law. *Haavisto v. Perpich*, 498 N.W.2d 746 (Minn.App.1993). The panel unanimously affirmed the trial court's holding that genuine issues of material fact existed about whether Allan was entitled to qualified immunity. The court remanded the Eighth Amendment claim against Allan to be tried with the malpractice claim. The panel also unanimously affirmed the district court's denial of partial summary judgment to Haavisto, holding that the defendants were not barred by the doctrine of collateral estoppel from litigating their liability for damages. This court granted review.

Haavisto argues initially that qualified immunity is unavailable to Pung, Erickson and Allan as a matter of law because the doctrine of collateral estoppel bars litigating liability issues already decided in *DeGidio v. Pung*, 704 F.Supp. 922. The court of appeals rejected Haavisto's collateral estoppel claim as to Allan because Allan had not had a full and fair opportunity to litigate issues involving the care of Haavisto, and as to Pung and Erickson because the federal action did not address issues of individual responsibility or consider the qualified immunity defense. *Haavisto*, 498 N.W.2d at 750.

■ The doctrine of collateral estoppel mandates that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits, based on a different cause of action, involving a party to the prior litigation." *Crowder v. Lash*, 687 F.2d 996, 1009 (7th Cir.1982) (citing *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)). For collateral estoppel to apply, (1) the issues in the prior and present adjudication must be identical; (2) there must have been a final adjudication on the merits; (3) the estopped party must have been a party or in privity with a party to the prior adjudication; (4) and the estopped party must have been given a fair and full opportunity to be heard on the adjudicated issue. *Oldham v. Pritchett*, 599 F.2d 274, 279 (8th Cir.1979); *Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990).

■ The first criteria which must be satisfied, whether the issue considered in the federal action is identical to the issue in this action, is in dispute. The issue in the federal action was not, as here, whether the seven month delay in diagnosing Haavisto's tuberculosis constituted cruel and unusual punishment, but instead was whether the response to the tuberculosis outbreak violated the inmates' constitutional rights. The Eighth Circuit Court of Appeals found that the record amply supported the district court's finding that the Stillwater officials responded to the tuberculosis outbreak with a series of negligent and reckless actions and affirmed the district court's conclusion that the continuing pattern of reckless and negligent conduct of the Stillwater officials amounted to deliberate indifference to the inmates' serious medical needs. *DeGidio*, 920 F.2d at 533. The federal district court did not address the issue of individual officials' constitutional wrongdoing. Therefore, because the issues decided in the federal action are not identical to the issue to be decided here, the doctrine of collateral estoppel does not prevent litigation of issues of the individual liability of the commissioner of corrections, the warden or the medical director. In addition to the above reasons, the medical director cannot be prevented from litigating issues involving his liability because he was dismissed from the federal action without prejudice without ever having been given a full and fair opportunity to be heard on the issues.

■ We now reach the issue of whether Pung, Erickson and Allan are entitled to qualified immunity from this suit. Qualified immunity "is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). An official will not be personally liable under § 1983 if the official conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396

(1981). Therefore, to prevail on the issue of qualified immunity, Haavisto must show that the conduct of the officials causing the seven month delay in the diagnosis of his active tuberculosis violated his right under the Eighth Amendment to be free from cruel and unusual punishment and that the constitutional right violated was a clearly established constitutional right in 1982 of which a reasonable prison administrator would have known.

Pung and Erickson argue, and the court of appeals held, that they are entitled to qualified immunity because they are entitled to rely on medical professionals for clinical judgments and "reasonably competent prison officials would not have known their reliance on medical professionals could constitute deliberate indifference to Haavisto's serious medical needs." *Haavisto*, 498 N.W.2d at 752. In a partial dissent from the court of appeals' opinion, however, Judge Norton reasoned that Pung and Erickson should not be immune from suit because they had failed to "put in place medical personnel and procedures upon whom they *could* reasonably rely." *Id.* at 755 (emphasis in original).

■ Haavisto's right under the Eighth Amendment to be free from "deliberate indifference to [his] serious medical needs" was established in 1976 by the Supreme Court in *Estelle*. 429 U.S. at 104, 97 S.Ct. at 291. To establish an Eighth Amendment violation, Haavisto must show more than ordinary negligence or medical malpractice. *Id.* at 106, 97 S.Ct. at 292; *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir.1981) (a "difference of opinion over matters of expert medical judgment" does not rise to a constitutional level); *Limbert v. Umar*, 585 F.Supp. 1413 (E.D.Pa. 1984). Following *Estelle*, the Second Circuit Court of Appeals found certain deficiencies in a prison medical system to be unconstitutional, such as delayed access to physicians and inadequate procedures to screen inmates' requests for medical assistance. *Todaro v. Ward*, 565 F.2d 48, 52–53 (2d Cir.1977), *aff'd*, *Todaro v. Coughlin*, 652 F.2d 54 (2d Cir. 1981). The Tenth Circuit subsequently allowed deliberate indifference to be shown "by proving there are such systemic and gross deficiencies in staffing, facilities, equipment,

or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

Not until *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), decided June 6, 1994, did the Supreme Court define the meaning of the term "deliberate indifference" as used in *Estelle.* The Court enumerated the duties the Eighth Amendment imposes on prison officials in providing humane conditions of confinement, such as "ensur[ing] that inmates receive adequate food, clothing, shelter and medical care and * * * tak[ing] reasonable measures to guarantee the safety of the inmates." *Id.* at ——, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984)). The Court focused, however, on the state of mind necessary to impose liability on prison officials for "deliberate indifference" to inmate health or safety. *Farmer,* —— U.S. at ——, 114 S.Ct. at 1977.

Prior to *Farmer,* the federal circuit courts of appeal were split as to whether a subjective test or an objective test should be applied to determine if an official was deliberately indifferent. *Compare McGill v. Duckworth,* 944 F.2d 344, 349 (7th Cir.1991) (applying a subjective test for "deliberate indifference"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992) *with Young v. Quinlan,* 960 F.2d 351, 360–61 (3rd Cir.1992) (applying an objective test for "deliberate indifference"). Under the subjective test, deliberate indifference requires the prison official to actually know of the risk of harm to which an inmate is exposed, while under the objective test, deliberate indifference is shown if the prison official knew or should have known of the unreasonable risk. The Court adopted the subjective test, holding:

> that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* —— U.S. at ——, 114 S.Ct. at 1979.

The case law prior to *Farmer* suggests that the treatment provided for Haavisto violated his constitutional rights. Courts have held that a continued pattern of negligent medical care could amount to deliberate indifference. *DeGidio,* 704 F.Supp. at 955 (citing *Todaro,* 565 F.2d at 52.)[1] The *DeGidio* court stated that "[p]erhaps the most obvious example of wanton neglect of an inmates' basic medical needs is the medical treatment provided to inmates Haavisto and [another inmate]." *DeGidio,* 704 F.Supp. at 957. The court observed that the tuberculosis diagnosis was made well after a physician exercising reasonable care and skill would have made the diagnosis, that Haavisto was subjected to unnecessary pain and suffering, and that he was unreasonably restricted access to x-rays, the prison physician, and an outside doctor. Further, the court stated that "Haavisto was subjected to cruel and unusual punishment when he was ostracized and threatened by inmates due to symptoms resulting from his undiagnosed tuberculosis." *Id.* Under *Farmer,* however, Pung and Erickson will not have violated Haavisto's constitutional rights unless they knew of and disregarded an excessive risk to Haavisto caused by inadequate medical care.

Haavisto's claim against Pung and Erickson is that systemic deficiencies in health care at the prison and their inadequate supervision of the health care system resulted in the delayed diagnosis of his tuberculosis. He contends that he may "maintain a theory of direct liability against a prison or other official if that official fails to properly train,

1. Also, courts have cited inadequate treatment or management of patients with tuberculosis as a factor in finding constitutional violations. *Newman v. State of Alabama,* 503 F.2d 1320, 1331 (5th Cir.1974); *Palmigiano v. Garrahy,* 443 F.Supp. 956, 975 (D.R.I.1977); *see also Freeman v. Lockhart,* 503 F.2d 1016, 1017–18 (8th Cir. 1974) (dismissal reversed where plaintiff claimed he was infected with tuberculosis when confined with a person known to have tuberculosis and subsequently denied treatment when tuberculosis settled in plaintiff's eyes).

supervise, direct or control the actions of a subordinate who causes the injury." *Pearl v. Dobbs,* 649 F.2d 608, 609 (8th Cir.1981). Pung, as deputy commissioner, had overall responsibility for Stillwater, including the maintenance of minimum standards of health care. Minn.Stat. § 241.021, subd. 1 (1994). Erickson's duties as warden included overall supervision of the prison, as well as correcting any deficiencies in the health care system. Minn.Stat. § 241.021, subd. 1(4). In *Farmer,* the Supreme Court expressly rejected claims against prison officials based on inadequate training. In *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the court held that a municipality can be liable for inadequately training its employees when the inadequate training demonstrates "deliberate indifference to the rights of its inhabitants." *Id.* at 389, 109 S.Ct. at 1205. The *Farmer* Court held that *Canton* only applies to municipalities and not to officials because it is necessary to look at the subjective state of mind of a government official before imposing liability under § 1983. *Farmer,* —— U.S. at ——, 114 S.Ct. at 1981. The *Farmer* Court rejected the proposition that an official can be held liable where "the risk was obvious and a reasonable prison official would have noticed it." *Id.*

■ The record contains no evidence sufficient to support a finding that Pung and Erickson knew of and disregarded an excessive risk to the inmates' health. There is evidence that the officials violated the *Hines* decree by not hiring a full-time physician and an administrative chief of medical services, and by not allowing inmates to be treated at their own expense by private physicians. Although violations of the *Hines* decree demonstrate a willingness on the part of the prison administrators to disregard a mandatory court decree concerning the conditions of the prison health care system, violations alone do not show that Pung and Erickson knew that Haavisto or other inmates were exposed to excessive risk by inadequate medical care. The record shows that Pung and Erickson knew that a physician was on site five days a week and on call seven days a week, twenty four hours a day, and that the prison was accredited by the American Correctional Association, whose accreditation is based in part on criteria involving the medical system. The record does not contain evidence to support the conclusion that Pung and Erickson knew of and disregarded an excessive risk to inmate health or safety. Therefore, we affirm the court of appeals in holding that the defense of qualified immunity bars, as a matter of law, Haavisto's 42 U.S.C. sec. 1983 claims against Pung and Erickson.

■ We must also consider whether the defense of qualified immunity applies to the § 1983 claim against Allan, the medical director. The court of appeals held that when the facts are viewed in the light most favorable to Haavisto, the record raises a question as to whether a reasonably competent physician would have diagnosed Haavisto's active tuberculosis, and whether Allan's actions exhibited deliberate indifference to Haavisto's serious medical needs and thus violated his Eighth Amendment rights. *Haavisto,* 498 N.W.2d at 753.

Allan argues that Haavisto's claim against him only amounts to a state law medical malpractice claim and not a federal constitutional claim. We agree. To satisfy the *Farmer* test, Allan must have known of and disregarded an excessive risk to the inmates' health. Haavisto's expert, Dr. Snead, who testified in the federal district court trial and submitted an affidavit in this case, states that his review of materials showed that Allan failed to educate himself regarding the medical conditions that might be anticipated in the prison setting and this made the provision of even minimally acceptable medical care impossible. Ignorance is not enough to show deliberate indifference. Allan must be aware of a risk and disregard it. The record does not contain evidence suggesting that Allan knew of the excessive risk to Haavisto or other inmates. We reverse the judgment of the court of appeals and hold that the defense of qualified immunity applies to bar the § 1983 claim against medical director Allan.

We affirm the grant of summary judgment to Pung and Erickson, and reverse the denial of summary judgment to Allan. We remand to the trial court for trial of the medical malpractice claim.

C0–92–1719 affirmed;

C7–92–1720 affirmed in part, reversed in part. Remanded.

TOMLJANOVICH, J., took no part in the consideration or decision of this case.

PAGE, J., took no part in the consideration or decision of this case.

ANDERSON, J., took no part in the consideration or decision of this case.

COYNE, Justice (concurring specially).

I concur in the result reached in the court's opinion, but I believe the majority's assumption that Dr. Allan negligently failed to diagnose Haavisto's tuberculosis over a period of 7 months is premature. At this point the only facts presented by the record are found in a convicted felon's version of the story. The radiologist reported to Dr. Allan that Haavisto's several chest X-rays were essentially negative although he once noted the presence of mild emphysema. There had not been a case of active tuberculosis at Stillwater Prison for 10 years, and there is the possibility that an inmate at a correctional institution might advance his own agenda by repeated reports of illness—real, imaginary, or feigned.

This is not to say that Dr. Allan exercised due care and skill in the performance of medical services at Stillwater. Neither is it to excuse his negligence, if any there was. It is simply to observe that the question of Dr. Allan's conduct is yet to be tried, and the facts demonstrated by the evidence produced for the jury's determination are yet to be found. Until a jury has decided that issue, it seems to me that Dr. Allan and his professional reputation are entitled to the same assumption of acceptable conduct that we accord defendants accused of criminal misconduct.