**James KNOBLAUCH, Plaintiff**

v.

**METROPOLITAN LIFE INSURANCE CO., INC., and Synchrony Integrated Disabilities Services, Inc., Defendants**

No. CIV.A.3:02–1801.

United States District Court, M.D. Pennsylvania.

April 27, 2004.

Richard J. Orloski, Orloski Hinga Pandaleon & Orloski, Allentown, PA, for Plaintiff.

Kirk L. Wolgemuth, Stevens & Lee, Reading, PA, for Defendant.

## MEMORANDUM

MANNION, United States Magistrate Judge.

Before the court is the defendants' motion for summary judgment filed pursuant to Fed.R.Civ.P. 56(c).

## I. PROCEDURAL HISTORY

The documents submitted by the parties establish that Mr. Knoblauch was employed by co-defendant Metropolitan Life ("MetLife") as of August 23, 2000, at which time he stopped working as a result of a diagnosis of pancreatitis, with subsequent serious and prolonged complications. He applied for and received short term disability benefits under the Disability Insurance Plan ("plan") maintained by MetLife for the benefit of its employees. After the required period of short term disability benefits expired, the plaintiff applied for and received long term disability benefits under the plan. The plan is administered by co-defendant Synchrony Integrated Disability Services, Inc. ("Synchrony").[1] On May 7, 2002, the plaintiff's long term disability benefits were terminated retroactive to April 30, 2002. The benefits were terminated at that time because the defendants concluded, after reviewing the plaintiff's medical records, including a functional capacity examination ("FCE"), that the plaintiff had recovered sufficiently from his medical conditions so that he could return to his regular job duties as a sales representative, or another similar job in the local economy. (Doc. No. 20, pp. 111–112). The plaintiff filed an administrative appeal

1. Syncrony describes itself as "integrated absence management, which includes group disability insurance or services from MetLife, workers' compensation insurance or services from The Travelers Indemnity Company and/or its property casualty affiliates, and may include family and medical leave administration from Metlife..." (Doc. No. 20, p. 101).

of this determination with the plan administrator which was denied on July 16, 2002. (Doc. No. 20, pp. 92–93).

The plaintiff subsequently filed a complaint in the Schuylkill County Court of Common Pleas seeking a determination as to his ERISA rights under the MetLife long term disability plan. The matter was removed to this court on October 8, 2002. (Doc. No. 1). The defendants filed an answer to the complaint on December 6, 2002. (Doc. No. 9).

The parties agreed to proceed before this Magistrate Judge. (Doc. Nos. 6, 8). The defendants filed a motion for summary judgment, supporting brief and Appendix ("Record") on March 24, 2003. (Doc. Nos. 18, 19, 20). After receiving an extension of time in which to do so, the plaintiff filed a response to the motion for summary judgment, and affidavits, on April 7, 2003; and a supporting brief and Appendix on April 18, 2003. (Doc. Nos. 24, 25, 26, 27). The defendants filed a reply brief on April 25, 2003.(Doc. No. 28). On June 19, 2003, the plaintiff filed a motion to supplement his brief in opposition, which was granted by Order dated June 26, 2003. The defendants' June 24, 2003 response to the motion was also admitted. (Doc. Nos. 32, 33, 34).

It appears that the substance of the disagreement among the parties revolves around the nature and extent of the plaintiff's residual medical condition; the plaintiff's time of injury job description and its physical requirements, and whether the plaintiff was capable of returning to work, and performing those, or similar, job requirements as of April 30, 2002.

2. Colectomy: "Excision of part or all of the colon." Taber's Cyclopedic Medical Dictio-

## II. FACTUAL BACKGROUND

On May 7, 2002, MetLife via Synchrony sent the plaintiff a letter advising him that he no longer continued to meet the plan's definitional requirements for long term disability benefits beyond April 30, 2002. The letter is quoted herein at length as it sets forth with particularity the facts of the matter, even though there is some dispute as to the proper interpretation of the medical record as put forth by the defendants. The letter states in pertinent part:

...According to your plan, "disabled means that, due to sickness, pregnancy or accidental injury, you are unable to earn more than 80% of your predisability earnings at your own or any occupation for any employer in your local economy." Your disability must also be continuous, and you must be under a doctor's care and receiving active treatment for the disabling condition. Proof of disability must be submitted in order to receive benefits under the plan...

...Review of the evidence in the file shows that you have not worked since August 23, 2000 due to pancreatitis and drainage of a pancreatic abscess on October 27, 2000. Subsequently you under went a laproscopic assisted endileostomy on December 12, 2000. You were then treated for a fistula in your colon, you underwent a partial colectomy [2] on June 18, 2001 with a closure of your colostomy. *On July 16, 2001, your provider stated that you were able to perform light duty work,* no strenuous activity, and no heavy lifting. You had foot surgery to remove two toe nails; you had problems with bleeding in the back of your right eye both related to diabetic changes. You underwent physical ther-

nary at 431 (19th ed.2001).

apy to your right shoulder for adhesive capsulitis. You were released to unrestricted activity for the right shoulder on October 16, 2001. On December 12, 2001 your toes were better. A 2 day functional capacity examination was done on April 3, 2002 and April 4, 2002 to assess your level of functioning. The test showed that you gave maximum consistent effort. *You showed no overt pain behavior on either day of testing.* You did complain of dizziness and throbbing in your head during floor to waist and unweighted rotation standing. You[r] blood pressure was elevated to 160/90 and 152/98. Dr. Brislin [the plaintiff's primary care physician] was contacted with regard to your elevated blood pressure. Dr. Brislin stated that you had recently undergone a stress test with negative findings therefore the testing was continued. According to the results of the functional capacity exam your general work capabilities fall into the medium work category as per the definition in the dictionary of occupational titles. Since your own occupation is classified as light duty work and you are able to perform medium work, you no longer continue to meet the definition of disability.

...After consideration of the above findings, it is concluded that there is no medical evidence to support continued functional impairment resulting in your inability to perform work-related functions of your own or any occupation. Accordingly, no additional benefits are due or payable in conjunction with this claim beyond April 30, 2002...

(Doc. No. 20, pp. 114–115)(emphasis added). The letter goes on to advise the plaintiff of his appeal rights. After the plaintiff appealed the determination, the defendants had a physician consultant, Joseph M. Nesta, M.D., review the record.

(Doc. No. 20, pp. 94–95). No independent medical examination was performed.

The plaintiff's response to this letter is that portions of the alleged medical record are incomplete in some cases, simply incorrect in other instances, and certainly overly optimistic regarding the plaintiff's functional capacities as of April 30, 2002. The plaintiff notes that, prior to the FCE done in April 2002, Dr. Brislin explained to Synchrony that, despite the plaintiff's progress, he still suffered from severe peripheral neuropathy, ongoing chronic pancreatic insufficiency described as very difficult to control despite medication therapy, and that he also had an unexplained myopathy with severe upper arm muscle pain. He was noted as having loss of hand strength. Dr. Brislin summarized as follows:

> ...From a physical capacity, his arm and leg strength and function are severely diminished. His progressive foot and leg neuropathy is controlled with medication but it is unlikely to improve. From my perspective, it is unlikely that he will be able to return to work in the near future...

(Doc. No. 20, p. 131).

The plaintiff was required under the terms of the long term disability plan to apply for Social Security disability benefits, which he did, successfully.

## III. ERISA STANDARD OF REVIEW

■ A denial of benefits challenged under Section 1132(a)(1)(B) of ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan vests such discretion in the administrator, the decision is to be re-

viewed under the more deferential arbitrary and capricious standard of review. *Id.; Luby v. Teamsters Health, Welfare and Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir.1991); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1256 (3d Cir. 1993).

█ Where the plan itself confers discretion on the administrator to determine eligibility for benefits, the district court may reverse the administrator's decision only if it was arbitrary and capricious, or it was inconsistent with the applicable plan provisions. The arbitrary and capricious standard is essentially the same as the "abuse of discretion" standard. *Abnathya v. Hoffmann–La Roche*, 2 F.3d 40, 45 (3d Cir.1993). The scope of review is narrow and the court is not free to substitute its own judgment for that of the defendant in determining eligibility for plan benefits. *Abnathya*, 2 F.3d at 45.

█ Thus, the *Firestone* standard is applicable in cases where the controlling plan documents give the plan administrator discretion over the payment of benefits. MetLife's plan provides, in pertinent part:

> ...MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments...

> ...In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such authority shall be given full force and effect, unless it can be shown that the interpretation was arbitrary and capricious...

(Doc. No. 20, pp. 206, 231). This language clearly gives the plan administrator discretion over the payment of benefits, and as such, the arbitrary and capricious standard applies in this case.

█ The court notes that plaintiff suggests that this court's standard of review more appropriately should be *de novo*. The plaintiff appears to argue that *de novo* review is required for two reasons. First, because the defendants originally approved long term benefits; and, second, because the plaintiff was required to apply for, and received, Social Security Disability benefits. These facts do not require a change in the standard of review to be applied. *Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir.2000)(discussing an apparent conflict of interest where an insurer both decides the claim and pays benefits from its own assets; facts not allegedly present in this case).

The court further notes that the plaintiff has also alleged a suspect relationship between MetLife and Isernhagen Quality Providers ("Isernhagen"), the company which performed the FCE. As a result the plaintiff requests this court to apply a heightened standard of review. The defendants argue that whatever standard this court chooses to apply, either arbitrary and capricious, or a heightened standard, this court must conclude that the termination of benefits was reasonably based upon the evidence before the plan administrator at the time the decision to terminate benefits was made. As noted above, the court finds that the arbitrary and capricious standard is applicable under the circumstances of this case.

## IV. DISCUSSION

The defendants have filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(c). Summary judgment is ap-

propriate when supporting materials, such as affidavits and other documentation, show there are no material issues of fact to be resolved, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *See Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). The Supreme Court has ruled that Fed.R.Civ.P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court further stated that "Rule 56(e)...requires the non-moving party to go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548; *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Pastore v. Bell Tel. Co. of Pennsylvania,* 24 F.3d 508, 511 (3d Cir.1994) (quoting *Harter v. GAF Corp.,* 967 F.2d 846, 852 (3d Cir.1992)). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Id.* at 323, 106 S.Ct. 2548; *Young v. Quinlan,* 960 F.2d 351, 357 (3d Cir.1992). To determine whether the non-moving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the non-movant. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

(emphasis in original). A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 250, 106 S.Ct. 2505. If the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). All inferences, however, " 'should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true'." *Pastore,* 24 F.3d at 512 (quoting *Big Apple BMW, Inc. v. BMW of N. America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993)).

With these principles in mind, the court will address the allegations in the complaint, and review the materials and documentation submitted by both parties in order to determine whether a triable issue of material fact has been established.

In his complaint the plaintiff alleges that the defendants' decision to terminate his long term benefits was not supported by any reasonable interpretation of the evidence of record on the whole. The plaintiff maintains, *inter alia,* that the defendants' termination of his long term benefits was unreasonable *per se* because there is nothing in the record which demonstrates that the defendants complied with the plan's definition of disability when it concluded that the plaintiff was no longer disabled. Specifically, the plaintiff states that no

physician, or other expert, ever stated that the plaintiff was capable of returning to work in such a capacity so as to be capable of earning more than 80% of his predisability earnings. As indicated above, disability is defined in the plan, in part, as an inability "to earn more than 80% of your predisability earnings" due to sickness. (Doc. No. 20, pp. 213). The plaintiff also states that he continues to suffer from numerous medical conditions which prevent him from performing the substantial and material duties of his regular occupation, and is also unable to perform any work for wage or profit for which he is reasonably fitted by education or experience, or may reasonably become qualified through training, education, or experience. (Doc. Nos. 1, 24, 26).

The defendants respond that the only issue before this court is whether the decision to terminate benefits was reasonable, given the record before the plan administer, citing *Abnathya, supra.* The defendants maintain that although the plaintiff did experience a serious illness, and does still suffer residual medical problems, he had recovered sufficiently from those problems as of April 30, 2002, so as to be able to return to his regular job duties as a sales representative, which the defendants describe, alternatively, as sedentary or light level work.

In support of its motion for summary judgment the defendants rely primarily on four medical records. The first is a brief hand-written reply to questions posed by the Synchrony medical case manager by correspondence dated July 31, 2001, made by the plaintiff's treating surgeon, Charles Scagliotti, M.D., to the effect that the plaintiff could return to work "...[A]nytime after July 20, 2001 ...as tolerated...PT has been instructed to progress as tolerated..." The case manager also requested Dr. Scagliotti to complete an enclosed physical capacity form, which he did not do. (Doc. No. 20, p. 150). A script signed by Dr. Scagliotti also dated July 20, 2001 states, "May return to light physical activity." (Doc. No. 20, p. 144).

The second record is a check-the-box-form signed by the plaintiff's orthopedic physician who treated him for right shoulder adhesive capsulitis and rotator cuff tendinitis. The physician checked the box which indicated "Yes" that the plaintiff may return to unrestricted activity, and he wrote in a date as of October 16, 2001. (Doc. No. 20. p. 145).[3]

The third record is the FCE performed by Cindy Oxendine, a part-time employee of Work Site Rehabilitation Consultants, P.C., which is a subcontractor for Isernhagen. Ms. Oxendine allegedly determined that the plaintiff's general work capabilities fell into the medium work category as defined by the Dictionary of Occupational Titles. Ms. Oxendine listed specific restrictions, however, which included a maximum floor to waist restriction of 35 pounds maximum, 25 pounds occasionally, 15 pounds frequently, and 10 pounds continuously. She also listed weight restrictions lifting waist to overhead as 25 pounds maximum, 20 pounds occasionally, 15 pounds frequently, and 10 pounds continuously. Front weight carrying was restricted at 35 pounds maximum, 30 pounds occasionally, 25 pounds frequently and 15 pounds continuously. Finally, horizontal

---

3. The court notes parenthetically that, in the context of social security disability proceedings, a check-the-box opinion may be afforded little weight. *Mason v. Shalala,* 994 F.2d 1058, 1065 (3d Cir.1993)("Form reports in which a physician's obligation is to check a box or fill in a blank are weak evidence at best..."). While this is not a Social Security case, the court believes the holding is equally applicable here, a "check-the-box" form is weak evidence at best.

lifting was restricted to 30 pounds maximum, 25 pounds frequently, and 15 pounds continuously. (Doc. No. 20, pp. 122–126; *See* also defendants' Brief in support of Motion for Summary Judgment, Doc. No. 19, pp. 4–5). This FCE is discussed in more detail below.

The fourth document relied upon by the defendants is a Physician Consultant Review dated July 9, 2002, performed by Joseph M. Nesta, M.D. Dr. Nesta did not examine the plaintiff. Dr. Nesta's report states in pertinent part:

> ...I read the data provided. This gentleman has a very complicated past medical history. I have attempted to try to reconstruct it from documentation provided by the surgeon, Dr. Charles J. Scagliotti's, note to MetLife on 1/18/01, and a note provided by the patient's primary care physician, Dr. James Brislin, dated February 22, 2002. To summarize, it appears from August 25, 2000 through October 16, 2000 this gentleman has had problems with biliary tract disease, and had his gallbladder removed. On October 18, 2000 this individual developed a pancreatic abscess which required surgery to drain the abscess. He also developed a pancreaticocolocutaneus fistula [4] which was surgically repaired. This individual also required a gastric feeding tube. *However by July 20, 2001, this individual was cleared by his surgeon to return to work.* This individual has also had a chronic pancreatic insufficiency. *This is treated with pancreatic replacement therapy.* In review of the medical notes from the patient's primary care physician, Dr. Thomas Brislin, there is no indication that this individual is having significant abdominal pain or diarrhea problems commonly associated with chronic pancreatic insufficiency. He is diabetic and he is on Amaril, 4 mg a day. There is no documentation in the chart of his blood sugars, so I am unable to comment on the control of his diabetes. This individual also has a history of peripheral neuropathy documented by consistent physical findings noted by the patient's primary care physician on a neurologic examination. Also in the note is that the patient's peripheral pain is controlled with Neurontin. Furthermore, this individual apparently has hypertriglyceridemia and is on Tricor. He has a history of myopathy and he has diabetic eye disease for which he has been evaluated by Dr. Ross in December, 2001. There are no documented abnormalities provided to state if his diabetic eye disease is impairing his ability to work since no visual acuities have been noted. The individual also has a history of hypertension for which he is on Altace...Documented blood pressures from his physicians dated 11/16/01 state that his blood pressure is 110/74. This individual also had problems with his toe nails and had to undergo foot surgery. He also had problems with right shoulder pain with capsulitis, but was cleared by an orthopedist to return to work as of October 16, 2001. This individual subsequently had a functional capacity evaluation done on April 3rd and 4th of 2002. *The patient's job description states that the patient is a sales representative which is a sedentary type position.* His job description includes the following: He needs to be able to sit with changes of position. He needs to occasionally carry a brief case and a lap-top computer

---

**4.** Fistula: "An abnormal tubelike passage from a normal cavity to a free surface or to another cavity." It may result from a congenital failure of organs to develop properly, or from abscesses, injuries, radiation, malignancies, or inflammatory that erode into neighboring organs. Taber's Cyclopedic Medical Dictionary 768 (19th ed.2001).

weighing between 10 and 20 pounds. He may have to climb stairs at client's homes. *Given this description, the patient had a functional capacity review done on April 3rd and 4th.* Pertinent findings at this point were that the patient could function in a medium job description. His current job position seems to meet this requirement. Although the patient has had problems with peripheral neuropathy, this appears to be treated with Neurontin, and should not impair his ability to do his position. The note that the patient's blood pressure was elevated during the functional capacity review merits some comments. *The individual performing the test was concerned enough to call the patient's primary care · physician regarding it.*[5] The physician noted that he had a normal stress test recently, and felt that the individual could continue to have the functional capacity review performed. Since he had the functional capacity review test, this supports the fact that the increased blood pressure documented is 150/90. There is no documentation that these were not astatic, but this should not preclude his ability to do a position...

... In conclusion, although this patient has had multiple medical problems in the past, *I do not find hard documentation in the chart to support his inability to do a fairly sedentary type position or up to medium light work after 5/1/02.*

(Doc. No. 20, pp. 94–95)(emphasis added).

In response to these documents the plaintiff has offered several medical records and the deposition testimony of Cindy Oxendine, the individual who prepared the FCE report on behalf of Work Site Rehabilitation and Consultants, P.C., and Isern-hagen. The plaintiff maintains that this court should ascribe little weight to Ms. Oxendine's FCE report because it is not impartial, but was influenced by Isernhagen. The plaintiff argues that the record suggests that the relationship between MetLife and Isernhagen was not at arms length, and that Isernhagen inappropriately influenced Ms. Oxendine to change her FCE findings.

■ Normally under the arbitrary and capricious standard, the district court is to "look to the record as a whole," which "consists of evidence that was before the administrator *when he or she made the decision being reviewed.*" *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.1997)(emphasis added). The relevant administrative record has been defined as including the evidence not only before the administrator at the time of the original decision in the matter, but also any additional records which may have been submitted and reviewed in the process of any administrative appeal. *Ernest v. Plan Administrator of Textron Insured Benefits Plan,* 124 F.Supp.2d 884, 893 (M.D.Pa.2000). The deposition testimony of Ms. Oxendine was not before the plan administrator at any time relevant to these proceedings. However, by Order dated January 27, 2003, this court granted the plaintiff's request to depose Ms. Oxendine for the limited purpose of determining whether such a relationship may have existed between MetLife and Isernhagen which could suggest a conflict of interest. (Doc. No. 13).

■ Applying this same reasoning, this court also notes that the plaintiff attempted in his brief in opposition to the defendants' motion for summary judgment to

---

**5.** The plaintiff argues that the entire FCE was flawed because Ms. Oxendine based her blood pressure and heart rate findings regarding the plaintiff upon mistaken information, most importantly, his age. (Doc. No. 20, Oxendine deposition, pp. 59, 65–67).

rely upon a medical report of Timothy S. Buffey, M.S., C.R.C. L.P.C., dated March 20, 2003, which purports to expose as a sham, Ms. Oxendine's FCE procedures and report. (Doc. No. 26, P. 8). This court will not consider that report because it was never before the plan administrator.

■ After having carefully reviewed all the documentation submitted by both parties, the court concludes, despite the defendants' assertions to the contrary, that the crucial piece of information the plan administrator relied upon in making the original decision to terminate the plaintiff's benefits was Ms. Oxendine's FCE performed on April 3, 2002 and April 4, 2002. The court has determined that the plaintiff has demonstrated that there are enough questions surrounding that FCE so as to make its alleged conclusions regarding the plaintiff's physical capabilities to be suspect, thus presenting a genuine issue of material fact requiring denial of a motion for summary judgment.

The problems that the court has identified regarding Ms. Oxendine's FCE and deposition testimony are as follows. Ms. Oxendine testified that she had originally concluded, on the basis of her examination, that the plaintiff was capable of light work, but that she changed this opinion to medium work after she submitted her initial report to Isernhagen for critique. Ms. Oxendine testified:

Q. And if I understand your testimony, when you had first completed the FCE, you had indicated that Mr. Knoblauch was capable of light work?

A Yes, correct.

Q. That was then sent to Isernhagen?

A. Yes.

Q. And they made a comment about whether Mr. Knoblauch was able to perform adaptational duties in an-

other category or something to that effect?

A. Correct.

Q. When you received that, did you then go back and modify your FCE report?

A. Correct.

Q. And when you modified it, did you then change the category of light to medium with specific restrictions?

A. Yes.

Q. And did you make that change at the specific recommendation of Isernhagen?

A. Yes.

(Doc. No. 27, Oxendine deposition, p. 61). In this court's estimation, Ms. Oxendine did not adequately explain in the deposition the reasons why she changed her opinion. We agree with the plaintiff that this fact raises questions as to possible undue influence on the part of Isernhagen.

The defendants argue, on the other hand, that it is of no moment that Ms. Oxendine changed her opinion of the plaintiff's functional capacities from light to medium work because the plaintiff's job was classified as sedentary/light in nature. This argument ignores the crux of the issue which is the possibility of undue influence being exerted upon the examiner.

Under other circumstances, it would be reasonable to conclude that a quality control system could demand that a product be reviewed by a higher authority before transmittal to the client, in this case Met-Life. The court has noted, however, that there are several documents in the file which appear to contradict the defendants' assertion that there was no questionable relationship between Isernhagen and Met-Life or Synchrony. For example, there is a document titled "Isernhagen Work Systems Functional Capacity Report" which is

on MetLife letterhead. (Doc. No. 27, Oxendine deposition, Ex. No. 1.)

There is another document titled "Isernhagen Quality Providers/MetDisAbility (sic) Referral Form" which gives specific directions to the FCE provider as to how MetLife FCEs are to be handled procedurally. (Doc. No. 27, Oxendine deposition, Exhibit 4). This form requires the reviewer to "[C]ontact MetDisability with a verbal report 1 day after the FCE is completed." (*Id.*) The record demonstrates that Ms. Oxendine did just that. There is a MetLife/Synchrony log entry dated April 5, 2002, which states:

> ...telephone call on voice mail from Cindy from Isernhagen at 2:52 pm. FCE done 4/3 and 4/4...ee (sic) did pretty well. He was compliant, cooperative, no self limiting. Unstable BP first day, said she had to call MD his pressure was so high. On the second day his heart rate was unstable and *he was having abdominal pain, so limitations were more medical [than] strength factors ...*"

(Doc. No. 20, p. 42)(emphasis added). This more contemporaneous statement of the FCE results is telling in that it suggests far more limitations on the part of the plaintiff than later statements made by MetLife/Syncrony to the plaintiff in support of its decision to terminate benefits.

Also disturbing is the fact that Ms. Oxendine testified that she had not been provided with a copy of the plaintiff's job description prior to performing the FCE. Ms. Oxendine stated, "...I did not have available to me at the time of his FCE a job description...[It] was not available at the time I performed the FCE." (Doc. No. 27, Oxendine deposition, p. 15).

Ms. Oxendine's testimony also undermines the post-termination, post-appeal records review performed on July 9, 2002, by Joseph M. Nesta, M.D. For example,

Dr. Nesta assumed that the plaintiff's job description was before Ms. Oxendine at the time the FCE was performed. He states:

> ...This individual subsequently had a functional capacity evaluation done on April 3rd and 4th of 2002. The patient's job description states that the patient is a sales representative which is a *sedentary type position.* His job description includes the following: He needs to be able to sit with changes of position. He needs to occasionally carry a briefcase and a lap top computer weighing between 10 and 20 pounds. He may have to climb stairs at client's homes. Given this description, the patient had a capacity review done on April 3rd and 4th. Pertinent findings at this point was that the patient could function in a medium job description. His current job position seems to meet this requirement...

> ...I do not find any hard documentation in the chart to support this to do a fairly sedentary type position or up to medium light work after 5/1/02.

(Doc. No. 20, pp. 94–95)(emphasis added).

The plaintiff also relies upon correspondence from his primary care physician, Dr. Thomas V. Brislin dated February 22, 2002, which states:

> James Knoblauch was seen on 02–22–02. He suffers from severe peripheral neuropathy. He was diagnosed with TYPE II diabetes in 1997. Subsequent gallstone pancreatitis with horrendous hospitalization complications and destructive hemorrhagic pancreatitis resulting in exploratory surgery · with eventual ileostomy and subsequent ileostomy reversal. *His blood sugars were extremely difficult to control according to the hospital records.* He developed a pancreatic fistula, subsequent lower extremity thromboembolic disease with

eventual IVC filter implanted. He has chronic leg edema which aggravates his peripheral neuropathy. *He has ongoing pancreatic insufficiency very difficulty to control despite high does of pancreatic supplements, enzymes supplements.* Has an unexplained myopathy with severe upper arm pain. He's having progressive loss of hand strength and is scheduled to see orthopedics for this problem...

...Missing a Neurontin dose results in severe neuropathic pain. He does try and maintain a reasonable activity level having been a prolific athlete in the past playing basketball in an adult league until the time of his catastrophic pancreatitis...

...From a physical capacity, his arm and leg strength and function are severely diminished. His progressive foot and leg neuropathy is controlled with medication but is unlikely to improve. From my perspective, it is unlikely he will be able to return to work in the near future.

(Doc. No. 20, p. 131)(emphasis added). It appears that this letter is the last medical record in the file, other than the Isernhagen FCE, and the after-appeal physician records review.

When Dr. Nesta did his records review, he stated, "...[B]y July 20, 2001 this individual was cleared by his surgeon to return to work." (Doc. No. 20, p. 94). He either did not know, or failed to include, the fact that the plaintiff's surgeon, Dr. Scagliotti, released the patient "to return to light physical activity...as tolerated," and that the plaintiff was "instructed to progress as tolerated." (Doc. No. 20, pp. 144, 150). No interpretation of Dr. Scagliotti's records could suggest that he was released to return to unrestricted full time work.

Dr. Nesta further stated in his report, "This individual also has had a chronic pancreatic insufficiency. This is treated with pancreatic replacement therapy." (Doc. No. 20, p. 94). As can be seen from Dr. Brislin's above referenced report, the plaintiff's ongoing pancreatic insufficiency was stated to be very difficult to control despite high does of pancreatic supplements, and enzyme supplements.

The defendants reply that:

...[T]his case involves a claim decision free from even the appearance of a conflict of interest...Here there is no evidence that would lead a reasonable person to conclude that MetLife's actions were suspicious or biased in evaluation of plaintiff's claim...In this case, the undisputed evidence from the medical examiner and the independent functional capacity evaluation established that Plaintiff had the capacity to return to his own position.

(Doc. No. 19, pp. 15, 16; Doc. No. 28, p. 6). Without belaboring the obvious, the plaintiff disagrees.

Citing *Abnathya*, 2 F.3d at 45, the defendants maintain that this court's sole function is to determine whether MetLife's decision to terminate benefits was reasonable. That is, the decision of the plan fiduciary should be upheld even if this court disagrees with it, provided that the decision is rationally based and consistent with the applicable plan provisions.

The defendants state further that the issue before the court is not whether some evidence in the administrative record may support plaintiff's claim, instead, the issue is whether MetLife's decision to accept contrary medical evidence was reasonable. The defendants note that "the mere existence of conflicting medical evidence in an administrative record does not render a denial of benefits arbitrary and capricious." (Citing *Vlass v. Raytheon Em-*

*ployees Disability Trust,* 244 F.3d 27, 32 (1st Cir.2001)).

Under the facts of this particular case the court has determined that the precise issue is not whether the plan administrator chose "contrary" or "conflicting" medical evidence, but whether he or she chose evidence which was, at worst incompetent, or, at best, tainted. For the reasons set forth above, the court is satisfied that the plaintiff has demonstrated that triable issues of fact exist as to whether the FCE, or Dr. Nesta's records review, constituted a reasonable or rational basis to terminate the plaintiff's benefits as of April 30, 2002.

■ Equally important, as the defendants correctly note, the decision of the plan fiduciary should be upheld, even if the court disagrees with it, provided that the decision is rationally based *and consistent with the applicable plan provisions.* Citing *Abnathya,* 2 F.3d at 45 (emphasis added). The plaintiff has set forth a forceful argument that the plan administrator's decision to terminate his long term disability benefits was not in compliance with the plan's provisions. Specifically, he maintains that there is no reliable evidence upon which one could conclude that the plaintiff was no longer disabled as defined by the plan.

As noted above, the plan defines disability, in part, as being "unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience, and Predisability earnings." The plaintiff's appeal was denied on July 16, 2002, on the basis that "[T]here is no documentation of functional limitations which preclude Mr. Knoblauch from earning more than 80% of his predisability earnings at any occupation for which he is reasonably qualified. Therefore, the origi-

nal claim determination was appropriate." (Doc. No. 20, p. 93).

The court agrees with the plaintiff that, other than this conclusory statement, there is no discussion in the record, whatsoever, as to whether the plaintiff was capable of earning 80% of his predisability earnings. In fact, the defendants collectively take the position that if the FCE concluded that the plaintiff was capable of "medium" work, he must be capable of all work. There was never any discussion concerning the plaintiff's other medical complications including the inability to control the pancreatic insufficiency with medications, or fatigue. Fatigue is documented profusely in the FCE, but never mentioned by the defendants. There is no acknowledgment that neither of the plaintiff's treating physicians ever released him to full time work. In fact, the only treating, or examining physician who released him without restrictions was the orthopedic physician, whose actual name was never mentioned, and who clearly was referring *only* to the plaintiff's shoulder capsulitis problem.

Again, the court is satisfied that the plaintiff has set forth a genuine issue of material fact as to whether the plan administrator complied with the procedures required by the plan. *See Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,* 222 F.3d 123, 129 (3d Cir.2000)("[A] plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."); *See* also *Smathers v. Multi–Tool, Inc./Multi–Plastics, Inc. Employee Health and Welfare Plan,* 298 F.3d 191 (3d Cir.2002)(Employer acted arbitrarily and capriciously in denying coverage without providing factual support for its determination that the claimant's intoxification caused the claimant's disabl-

ing accident, thus precluding entitlement to benefits under the plan.); Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

It appears that the plan administrator did not believe that he or she had to actually show that the plaintiff had recovered to the point where he was capable of earning 80% of his predisability earnings, as required by the plan. Although the defendants terminated the plaintiff's benefits on the basis that he was capable of earning 80% of his predisability earnings, no supporting facts are cited. This court has no information, for example, what the plaintiff's earnings were before he became disabled. There is also no indication that the defendants offered the plaintiff the option to return to his pre-disability position as a sales representative in a modified capacity, even though the plan offers a comprehensive return to work vocational rehabilitation program.

On the other hand, the plaintiff has submitted reports of two physicians that he was not capable of returning to work without restriction. Even the FCE relied upon by the defendants sets forth numerous physical restrictions.

In reviewing a motion for summary judgment, all inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. *Pastore*, 24 F.3d at 512 (quoting *Big Apple BMW, Inc. v. BMW of N. America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993)). Applying this standard, this court is satisfied that the plaintiff has set forth sufficient facts that there are genuine issues of material fact as to whether the defendants decision to terminate his long term disability benefits as of April 30, 2002 was reasonable.

On the basis of the foregoing, the defendants' motion for summary judgment, (**Doc. No. 18**), is **DENIED**, an appropriate order will follow.

## ORDER

1. Defendants motion for summary judgment (Doc. No. 18) is **DENIED**;

2. The matter is set down for a settlement conference on **Thursday, June 10, 2004 at 2:00 P.M.** in Courtroom No. 1, Max Rosenn United States Courthouse, 197 South Main Street, Wilkes–Barre, Pennsylvania. Particular requirements of the settlement conference are included in a separate order filed this day;

3. The final pretrial conference will be held on **Friday, August 13, 2004 at 2:30 P.M.** in Courtroom No. 1, Max Rosenn United States Courthouse, 197 South Main Street, Wilkes–Barre, Pennsylvania; and,

4. The trial of this matter is scheduled for **Monday, August 23, 2004 at 9:30 A.M.** in Courtroom No. 1, Max Rosenn United States Courthouse, 197 South Main Street, Wilkes–Barre, Pennsylvania